## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHERYL C. BRADLEY**<br>**5611 South Ireland Street**<br>**Centennial, CO 80015,** | **Case No.: 1:17-cv-01791** |
| **JOHN M. WAKEFIELD**<br>**406 Heflin Street**<br>**Charlotte, NC 28205,** | **First Amended**<br>**Collective Action Complaint**<br><br>**Jury Trial Demanded** |
| **MAIJA LIISA VARDA**<br>**1917 Colfax Avenue South, Apartment 4**<br>**Minneapolis, MN 55403,** | |
| **on behalf of themselves and all persons**<br>**similarly situated** | |
| **Plaintiffs,** | |
| **v.** | |
| **VOX MEDIA, INC., d/b/a SB NATION,**<br>**1201 Connecticut Avenue NW, 11th Floor**<br>**Washington, DC 20036** | |
| **Defendant.** | |

## FIRST AMENDED COLLECTIVE ACTION COMPLAINT

Plaintiff Cheryl C. Bradley ("Bradley"), Plaintiff John M. Wakefield ("Wakefield") and

Plaintiff Maija Liisa Varda ("Varda," together with Bradley and Wakefield, "Plaintiffs"),

through their undersigned counsel, individually and on behalf of all persons similarly situated,

file this First Amended Collective Action Complaint against Defendant Vox Media, Inc., d/b/a

SB Nation ("Defendant" or "Vox"), seeking all available relief under the Fair Labor Standards

Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA").

## JURISDICTION AND VENUE

1.      Jurisdiction over Plaintiff's FLSA claims is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.   Defendant is headquartered in this District.   The events giving rise to Plaintiff's claims occurred within this District, and Defendants conduct business in this District.

## PARTIES

3.      Plaintiff Cheryl C. Bradley ("Bradley") is an individual currently residing in Centennial, Colorado.   She was employed by Defendant as a Site Manager (otherwise known as a Managing Editor) from on or about June 2013 through on or about February 2015, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action.   *See* ECF No. 1, Ex. A.

4.      Plaintiff John M. Wakefield ("Wakefield") is an individual currently residing in Charlotte, North Carolina.   He was employed by Defendant as a Site Manager from on or about December 2015 through on or about May 2017, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action.   *See* ECF No. 15.

5.      Plaintiff Maija Liisa Varda ("Varda" and collectively with Bradley and Wakefield, "Plaintiffs") is an individual currently residing in Minneapolis, Minnesota.   She has been employed by Defendant as a Site Manager from on or about May 2016 through the present, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action. *See* ECF No. 9.

6.      Defendant Vox Media, Inc., d/b/a SB Nation ("Vox") is a Delaware corporation headquartered in the District of Columbia, and operating nationwide.   Vox maintains hundreds of

sports websites affiliated with its business division known as "SB Nation."

7.      Defendant employs individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206-207.

8.      Defendant's annual gross volume of business exceeds $500,000.

## CLASS DEFINITIONS

9.      Plaintiffs bring Counts I and II of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b) as a collective action on behalf of themselves and the following class of potential opt-in litigants:

> All current or former Site Managers and Managing Editors who performed work in the United States for Vox Media, Inc. in its SB Nation business division within the past three years (the "FLSA Class").

10.     Plaintiffs reserve the right to redefine the FLSA Class prior to notice or class certification, and thereafter, as necessary.

## FACTS

11.     Defendant Vox, is a media corporation which operates and maintains media websites, including approximately 319 sports websites affiliated with its business division known as SB Nation.

12.     On August 14 and 15, 2017, the sports website Deadspin published a pair of articles revealing Vox's treatment of its Site Managers and other content creator employees, which included negative feedback from many such employees concerning Vox's pay practices.[1]

---

[1] See "How SB Nation Profits Off an Army of Exploited Workers," *available at*: http://deadspin.com/how-sb-nation-profits-off-an-army-of-exploited-workers-1797653841 (last accessed October 11, 2017); "SB Nation Bosses, Current And Former Workers Discuss Pay,

**Plaintiff Bradley**

13.     On or about June 1, 2013, Bradley signed a "Blogger Agreement," attached hereto as Exhibit 1, which to the extent lawful, governed the terms of the relationship between Bradley and Vox.

14.     From approximately June 2013 through February 2015, Bradley served as a Site Manager for Vox's "Mile High Hockey" website.

15.     Bradley's Blogger Agreement obligated her to create content to place on Vox's SB Nation website known as Mile High Hockey.[2]  Ex. 1, Blogger Agreement at A-1.

16.     Mile High Hockey is SB Nation's website for the Colorado Avalanche, a professional ice hockey team, which is part of the National Hockey League ("NHL").

17.     During all times relevant to this action, Travis Hughes served as SB Nation's "League Manager" for all of its NHL team sites, including Mile High Hockey.  Hughes' role was to supervise all NHL Site Managers at Vox, including Bradley.

18.     During Bradley's employment at Vox, among other duties, Bradley regularly watched Avalanche games, wrote and published approximately five or six articles per week (more during peak times), managed other writers (which included relaying Vox directives from Travis Hughes), edited and approved new writers' articles, monitored search engine optimization data, and managed comment sections and Fan Post articles on the Mile High Hockey website.

19.     Bradley also managed Mile High Hockey's Facebook and Twitter social media accounts.  On both accounts, Bradley would share links to Mile High Hockey articles, as well as Avalanche team information including: transactions, special events, and other information

---

Management, And More In Emails And Leaked Memos," *available at*: http://deadspin.com/sb-nation-bosses-current-and-former-workers-discuss-pa-1797868635 (last accessed October 11, 2017).

[2] https://www.milehighhockey.com/ (last accessed 8/31/2017)

provided by the Avalanche's media relations department.  Bradley "live Tweeted" during games, practices, and training camps in order to give readers play-by-play information about the team's performance.  Finally, Bradley would remove any objectionable content on both the Facebook and Twitter feeds.

20.     While Site Manager, Bradley regularly worked thirty (30) to forty (40) hours per week, and was compensated at a rate of $125 per month.

21.     On an annual basis, during peak times, such as near the NHL draft, trade and free-agency deadlines, training camps, pre-season (which occurred in late September and early October), or when Bradley was understaffed, Bradley worked in excess of forty (40) hours per week, and as much as fifty (50) hours per week.

### Plaintiff Wakefield

22.     On or about January 1, 2016, Wakefield signed a "Blogger Agreement," substantially similar to Bradley's and Varda's, attached hereto as Exhibit 2, which to the extent lawful, governed the terms of the relationship between Wakefield and Vox.

23.     From approximately December 2015 through May 2017, Wakefield served as a Site Manager for Vox's "Through It All Together," website.

24.     Wakefield's Blogger Agreement obligated him to create content to place on Vox's SB Nation website known as Through It All Together.[3]  Ex. 2, Blogger Agreement at A-1.

25.     Through It All Together is SB Nation's website for Leeds United Football Club ("Leeds United"), an English professional soccer team.

26.     During all times relevant to this action, Jeremiah Oshan served as SB Nation's "League Manager" for all of its soccer team sites, including Through It All Together.  Oshan's

---

[3] https://throughitalltogether.sbnation.com/ (last accessed 10/10/2017)

role was to supervise all soccer Site Managers at Vox, including Wakefield.

27.     During Wakefield's employment at Vox, among other duties, Wakefield regularly watched or listened to Leeds United games, personally wrote and published between approximately one (1) and three (3) articles per week, managed other writers (including by relaying Vox directives from Jeremiah Oshan), edited and approved between two (2) and five (5) articles written by the site's staff writers, monitored search engine optimization data, and managed comment sections and Fan Post articles on the Through It All Together website.

28.     Wakefield grew Through It All Together's Twitter account to over 4,500 followers, which significantly increased Through It All Together's web site traffic.

29.     Wakefield created a second Through It All Together Twitter account, for live-tweeting during games.  Wakefield grew this account to over 1,800 followers, which further increased Through It All Together's web site traffic.

30.     While Site Manager, Wakefield regularly worked thirty (30) to forty (40) hours per week, and was compensated at a flat monthly rate.  Vox initially paid Wakefield $50 per month, and later increased his pay to $75 per month.

31.     On an annual basis, during the soccer season, as well as during peak news generating periods during the off-season, such as the Transfer Window period, Wakefield often worked in excess of forty (40) hours per week, and as much as sixty (60) hours per week.

**Plaintiff Varda**

32.     On or about May 1, 2016, Varda signed a "Blogger Agreement," substantially similar to Bradley's and Wakefield's, attached hereto as Exhibit 3, which to the extent lawful, governed the terms of the relationship between Varda and Vox.

33.     From approximately May 2016 through present, Varda has served as a Site

Manager for Vox's "Twinkie Town," website.

34.    Varda's Blogger Agreement obligated her to create content to place on Vox's SB Nation website known as Twinkie Town.[4]  Ex. 3, Blogger Agreement at A-1.

35.    Twinkie Town is SB Nation's website for the Minnesota Twins, a professional baseball team, which is part of Major League Baseball ("MLB").

36.    During all times relevant to this action, Justin Bopp served as SB Nation's "League Manager" for all of its MLB team sites, including Twinkie Town.  Bopp's role was to supervise all MLB Site Managers at Vox, including Varda.

37.    During Varda's employment at Vox, among other duties, Varda regularly wrote daily general interest articles about the Twins, reported breaking Twins news in a timely fashion, performed historical and statistical research, wrote series previews, managed a team of other Twinkie Town staff writers ranging from about six (6) to twelve (12) in number, wrote or scheduled daily game coverage and recaps of Twins games, coordinated coverage schedules among staff writers, edited and provided feedback on staff writer articles, contacted staff writers to address specific concerns, communicated with Justin Bopp and relayed Vox directives to staff writers, monitored the Twinkie Town comment section to encourage community participation and remove objectionable content, managed all aspects of the Twinkie Town Facebook page and Twitter feeds, actively searched for and recruited new writers, reviewed resumes and writing samples of prospective writers, and trained new writers on best practices.

38.    Vox required Varda to publish several articles on Twinkie Town per day, whether written by her or Twinkie's Town's staff writers.

39.    Varda personally authored an average of approximately two (2) articles per day,

---

[4] https://www.twinkietown.com/ (last accessed 10/10/2017)

and edited on average approximately two (2) articles per day, which were first drafted by Twinkie Town's staff writers.

40.     While Site Manager, Varda regularly worked thirty (30) to forty (40) hours per week, and was compensated at a rate of $400 per month.

41.     During peak times, such as near MLB trade, draft and free-agency deadlines, playoffs, MLB All Star game week, Winter Meetings or when Varda was understaffed, Varda often worked in excess of forty (40) hours per week, and as much as fifty (50) hours per week.

## EMPLOYMENT RELATIONSHIP

42.     Federal courts weigh several non-exclusive factors in order to determine whether, as a matter of "economic reality," an employment relationship exists.  *See, e.g., Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) ("we ask 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" (Citation omitted; quoting *Henthorn v. Department of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)).  "Depending on the circumstances, the inquiry should not be limited to these factors."  *Ivanov v. Sunset Pools Mgmt. Inc.*, 567 F. Supp. 2d 189, 194 (D.D.C. 2008).

43.     In *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) the Court of Appeals for the Third Circuit considered the following factors:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanence of the working relationship;

8

6) whether the service rendered is an integral part of the alleged employer's business.

*Vox Had the Power to Hire and Fire Employees*

44.     Vox, per League Manager Travis Hughes, interviewed Bradley for employment as Site Manager for Mile High Hockey. On behalf of Vox, Mr. Hughes hired Bradley as Site Manager.

45.     On one occasion on or about February 2015, a staff writer for Mile High Hockey wrote an article which expressed that Vox branded each of its business divisions in specific ways to advertisers, and defined the target audience on its SB Nation sites as being men only.  The staff writer thus expressed the opinion that Vox's branding was misogynistic and ignored the female presence on SB Nation's sites, such as female staff or female site visitors. Without consulting Bradley, NHL League Manager Hughes immediately deleted the post and banned the staff writer from SB Nation.

46.     Bradley later defended the staff writer to Mr. Hughes.  Less than one week later, Hughes fired Bradley from her position as Site Manager under false pretexts, revoking all editorial and authoring access to the Mile High Hockey website without advanced warning.

47.     On or about December 10, 2015, Wakefield applied for the position of Site Manager for Through It All Together by contacting Vox Soccer League Manager Jeremiah Oshan. Mr. Oshan interviewed Wakefield for the position and, on behalf of Vox, hired Wakefield as Site Manager.

48.     On or about April 2016, Varda applied for the position of Site Manager for Twinkie Town, in response to a Vox job posting.

49.     Vox MLB League Manager Justin Bopp interviewed Varda for the position.  On behalf of Vox, Mr. Bopp hired Varda as Site Manager.

50.     Vox advertised open positions for SB Nation's Site Managers, often in the same or similar manner as Vox advertisements for paid positions that Vox classified as employee positions.[5]   For example, a posting for Site Managers of SB Nation's Detroit Pistons website "Detroit Bad Boys" is reproduced herein[6]:

## Managing Editor, Detroit Bad Boys (Detroit Pistons)

**at Vox Media** (View all jobs)

Remote

Vox Media's SB Nation is the fastest-growing online sports media brand and the largest network of more than 300 individual fan-centric sports communities, including SBNation.com, our national flagship property. Our network is powered by the most respected web-native sports journalists. One part of our network needs a new steady hand, and that's where you come in.

**Detroit Bad Boys**, the SB Nation blog covering the **Detroit Pistons**, is looking for a new manager.

The perfect candidate can express her or his thoughts about the team and the sport in a consistently engaging way. Hopefully you're as big of a nerd about the Internet, social media and sports journalism as you are about the Pistons. You should have experience managing people, the ability to delegate and an insatiable desire to discover and produce work that Pistons fans love.

**Responsibilities:**

- Write, edit and ensure regular publication of quality  writing / video content.
- Manage a diverse team of writers.
- Operate the site's Facebook page, Twitter account and other social media channels.
- Communicate regularly with SB Nation management about site goals, traffic analysis and progress.
- Shape the editorial direction of Detroit Bad Boys.

**Requirements:**

- Obsessive knowledge of and passion for the Detroit Bad Boys and the NBA.
- You're a great writer, communicator and manager.
- You're experienced with web publishing tools (or you're a quick learner).
- You take pride in what you do.

**This is a contractor position that pays a small monthly stipend**. Some daytime availability is preferred.

51.     Vox utilized its pool of Site Managers as a means by which to hire salaried writers whom *it classified* as "employees" under the FLSA.  However, only a small fraction of

---

[5] https://www.voxmedia.com/pages/careers-jobs (last accessed 10/13/2017)

[6] *Supra*, n.1

Site Managers ever became salaried writers classified as "employees" within SB Nation.

*Vox Supervised and Controlled Plaintiff's Work Schedules and
Conditions of Employment*

52.     Vox maintained control over the manner in which Plaintiffs performed their services.

53.     Vox required Plaintiffs, whether personally or through the supervision of their staff writers, to cover each of the Colorado Avalanche, Leeds United, and Minnesota Twins games, respectively, and "post a post-game/event commentary/recap, ideally immediately following the completion of any game/event, but in all cases within six (6) hours of the end of each game/event (including pre-season and post-season), or no later than 9 a.m. Eastern Time the morning following the game/event, whichever is earlier."  Exs. 1-2, Blogger Agreement at A-1; Ex. 3, Blogger Agreement at A-1 (similar).

54.     Plaintiffs regularly watched games and wrote recaps and previews for the Avalanche, Leeds United, and Twins games.

55.     Despite the fact that the Blogger Agreement purported to allow Plaintiffs "editorial control over the Work Product," Vox maintained complete authority to "edit any Work Product, add content to the Site, and/or take down any Work Product or the Site in its entirety, within [its] reasonable business judgment."  Exs. 1-3, Blogger Agreement at ¶ 3(d).

56.     On occasion, Vox actually exercised its control to edit the work product of Site Managers, for example when content was deemed to be controversial.

57.     Vox retained "exclusive control and decision-making authority regarding any and all revenue-generating opportunities with respect to the Site."  Exs. 1-3, Blogger Agreement at ¶ 3(e).

58.     For purposes of enhancing SB Nation's web search rankings, and therefore its

advertising revenue, Plaintiffs were required to add certain search terms to their articles, title articles in a certain way, and write at least 150 words in each article.

59.     While employed by Vox, Plaintiffs were <u>prohibited</u> from providing writing or editing services to competitors of SB Nation, including, but not limited to, Bleacher Report and ESPN.  Exs. 1-3, Blogger Agreement at ¶ 7.

60.     On an ongoing basis, Vox required Plaintiffs to watch training videos, in their capacity as Site Managers at SB Nation.

61.     Deadspin published a leaked memo from SB Nation NBA League Manager Seth Pollack to his Site Managers, stating in part that "all writer contributors will be asked to sign new contracts specifying that **they will only get paid if they reach their target number of posts in a given month**":

> Over the years our little network of 33 sites covering the NBA, the WNBA and NCAAWB, and the D-league has grown and changed a lot. When we started blogging in the mid-2000's it was a one strong voice per site kind of world. We've since expanded our coverage, voices and methods to provide team fans with the best source of the information they crave.
>
> Someone recently said about ESPN: "They cover sports a mile wide and an inch deep. They do not align with sports fans' passions and don't give most sports, athletes, and fans the coverage they need and deserve." We are the opposite of that. We cover our teams with depth, passion and detail that is unmatched in the digital sports marketplace.
>
> Fans have rewarded our approach and your dedication with hundreds of millions of visits, tens of thousands of comments, and over a decade of support. Unfortunately, after a year of flat traffic we're seeing a troubling decline. We've also been flat since 2012 in the amount of content we produce despite annual increases in our budget.
>
> It's time to tweak a few things about how we do business.

### 1.    How we pay contributors

**Background**: We've traditionally paid contributors on a fixed monthly stipend. In our contract we ask for X amount of posts per week. But we now have over 120 paid folks and it's simply not possible to monitor and follow up on those that aren't meeting their contractual targets.

**Change**: All writer contributors will be asked to sign new contracts specifying that they will only get paid if they reach their target number of posts in a given month. Typically, we've asked for four posts per week but we'll review each person's situation with the site manager.

**Keys to Execution**: Site managers will need to review their paid staff and work with the league manager to determine the right target and pay level for each paid staff member. We'll notify contributors at least 30 days prior to the change and get them new contracts. At the end of each month, the league manager will review the list of paid contributors and compare their target to their actual results and pay those that meet the goal.

Note: I believe as a result of this change we'll be able to open up more paid writing positions. We'll watch and see how things play out over the first few months and we may try a few pilot programs at select sites to test various options for creating more paid positions.

### 2.    Create three site "tiers" and increase the budget and expectations for Tier 1 sites

**Background:** Since 2012 we've tried a variety of methods to increase the number of articles we produce without success and we're actually down about 14% in the first four months of 2017. Our goal is to increase the amount of content we produce by putting more money in the top sites that get the most traffic for each post.

**Change:** We create three site "tiers". The Tier 1 sites will have enough budget to meet a goal of five posts per day (in-season average) and meet other site management targets. Tier 2 and 3 sites will see no change to their budget and will have posting goals appropriate for their size.

**Keys to Execution**: After determining which sites are in which tiers we'll work with the Tier 1 site managers to review staff and budget and come up with individual plans to make any personnel changes needed to meet the goals.

3.     **Update the monthly incentive program**

**Background:** We launched the monthly incentive program about four years ago and we now have three different monthly targets that each "pay out" $100 if met. The impact of these incentives has diminished over time and need to be updated.

**Change:** Starting on August 1, we will have one monthly incentive program for site managers. The metric will be Posts Per Day with specific targets set based on tier level and adjusting during the off-season months of August and September. The incentive will be 25% of the site manager's base stipend amount so that if the target is reached in a given month the manager will receive their full stipend. If the target is not met they will receive 75% of their stipend amount.

Facebook posting and Facebook Live shows will be treated as specific site positions where contributors will be paid based on meeting targets just as contributing writers.

**Execution:** The league manager will set and communicate PPD targets for each tier and work with site managers to identify staff members for the the Facebook roles.

*Supra*, n.1 at Laura Wagner comment, 8/14/17 5:47pm. (Emphasis added).

62.     The leaked memo demonstrates that in order to maximize ad revenue,[7] Vox attempted to monitor and control its contributors' and Site Managers' posting volume to ensure compliance with "contractual targets," by threatening not to pay its Site Managers unless the targets were met.

63.     For the purpose of increasing its ad revenue, and despite the fact that Site managers never shared in such revenue, Vox regularly encouraged and pressured its Site

---

[7] The vast majority of SB Nation's web traffic, and therefore advertising revenue, came from Team Sites managed by Site Managers, rather than from sbnation.com.  *See* "Leaked Data Show Vast Majority Of SB Nation Page Views Come From Team Sites," *available at*: https://deadspin.com/leaked-data-show-vast-majority-of-sb-nation-page-views-1803138754 (last accessed October 11, 2017).

Managers to meet content posting goals and requirements.

64.     Vox terminated Varda's predecessor, Jesse Lundt, because Mr. Lundt did not achieve Vox's content posting requirements.

### *Vox Maintained Employment Records*

65.     Vox maintained Plaintiffs' employment contracts (which Vox titled "Blogger Agreements").

66.     Vox maintained records relating to Plaintiffs' and the FLSA Class' team site traffic, as well as records relating to whether Plaintiffs were meeting their contractual target demands. Those records were utilized in order to evaluate Plaintiffs' and the FLSA Class' performance as Site Managers.

67.     Without access to discovery, Plaintiffs are without specific knowledge as to the extent to which Vox maintains other employment records relating to Plaintiffs and the FLSA Class.

### *Vox Determined Plaintiffs' Rate and Method of Payment;* *Plaintiffs Had No Opportunity for Profit or Loss*

68.     During their employment within SB Nation as Site Managers, Plaintiffs possessed no opportunity for profit or for loss.  Rather, Bradley was paid a flat $125 per month, Wakefield $50 (and later $75) per month, and Varda $400 per month, regardless of Vox's profitability or how many hours they each worked.

69.     No matter how many articles Plaintiffs created for SB Nation or how high quality those articles were, Plaintiffs would only receive a low set monthly compensation.  Exs. 1-3, Blogger Agreement at A-2.

70.     Vox "own[ed] and retain[ed] all right, title, and interest in and to the Site, including, without limitation, the domain name of the Site (including any and all credit for traffic

thereto), the Site's 'look and feel' and any branding or content contained on the Site (including but not limited to the right to register and use the name of the Site or any variation thereof as a Twitter username)." Exs. 1-3, Blogger Agreement at ¶ 3(a).

71.     Plaintiffs assigned to Vox, "all rights, title, and interest in and to any work product [they] created…including all copyrights, trademarks and other intellectual property rights embodied therein." Exs. 1-3, Blogger Agreement at ¶ 3(b).

72.     Plaintiffs did not share in Vox's advertising revenue and "Vox Media, as the owner of the Work Product," could in its sole discretion "use, publish, distribute and reproduce the Work Product in [outside] media, and retain any revenue generated thereby."  Exs. 1-3, Blogger Agreement at ¶ 3(c).  Vox did not allow Plaintiffs to advertise their personal brands or content on their respective SB Nation websites.

73.     When Plaintiffs Bradley and Wakefield personally received inquiries from prospective advertisers for advertising to be placed on their respective team sites, they were each required to by Vox, and did, refer the inquiries to their respective League Managers.

74.     Advertisers approached Plaintiff Varda many times asking if they could advertise on Twinkie Town.  Initially, each time this happened, Varda would tell the advertisers that they should contact SB Nation management directly.  Eventually, Varda received so many advertisement requests that she did not always respond to all such inquiries.

75.     It was common knowledge at SB Nation that Site Managers were not allowed to enter into advertisement agreements, much less receive any revenue from advertisements on the team sites.  *See also* Exs. 1-3, Blogger Agreement at ¶ 3(e) ("[f]or the avoidance of doubt, the parties agree that Vox Media shall have exclusive control and decision-making authority regarding any and all revenue-generating opportunities with respect to the Site.").

*Plaintiffs' Investment of Equipment or Materials*

76.     Plaintiffs were not required to invest in equipment or materials with respect to their employment at Vox.  Plaintiffs merely used their existing home computers and smart phones to perform services for Vox.

*Plaintiffs' Services Required No Special Skill*

77.     Plaintiffs' services required no special skill.  For example, no specific academic qualifications were required to be a Site Manager, much less a college degree.  No specific professional experience was required of Plaintiffs.  *See* ¶ 50, *supra*.

*The Degree of Permanence of the Relationship*

78.     Plaintiffs' employment with Vox was in the nature of a permanent relationship. Plaintiffs signed and worked under the terms of Blogger Agreements and regularly worked 30-40 hours a week or more for Vox's SB Nation.

79.     SB Nation entered into separate freelance contracts with some Site Managers which obligated the Site Manager to write a particular piece on a pre-defined subject.  Those freelance contracts did not relate to the Site Managers' performance of duties for their respective team sites, and were stand-alone assignments.

*Plaintiffs' Services Were An Integral Part of Vox's Business*

80.     Vox is a media company and its SB Nation division is in the business of sports media.  Vox and SB Nation's very business could not exist without the content created by its writers, including Plaintiffs and other Site Managers. Indeed, the content created by its writers constitutes the entirety of the product offered by SB Nation.  Without the existence of the content published on Plaintiffs' and the FLSA Class' team sites,[8] advertisers would not pay Vox to

---

[8] *Supra*, n. 7.

advertise on SB Nation sites.

81.     As a matter of economic reality, Plaintiffs were dependent on Vox for income, and therefore were employees of Vox.  Given the number of hours Plaintiffs worked for Vox, the possibility and extent of outside employment was heavily curtailed.

## WILLFULNESS

82.     James Bankoff ("Bankoff") is the current Chief Executive Officer (CEO) of Vox and has served in that role since approximately 2009.

83.     Prior to his tenure at Vox, Bankoff served as Executive Vice-President of Programming and Products at America Online, Inc. ("AOL") from approximately March 2002 to approximately March 2007.

84.     Marty Moe ("Moe") is the current President of Vox and has served in that role since approximately 2011.

85.     Prior to his tenure at Vox, Moe served as a Senior Vice President of AOL's Media Unit from approximately 2001 to approximately October 2010.

86.     Moe is an attorney and practiced law at the prominent law firm of Skadden, Arps, Slate, Meagher & Flom LLP for five (5) years prior to joining AOL.  Prior to his tenure at Skadden Arps, Moe clerked on the U.S. Court of Appeals for the District of Columbia Circuit.

87.     Lauren Fisher ("Fisher") has served as General Counsel and Chief Legal Officer at Vox since approximately 2008.

88.     Prior to her tenure as General Counsel at Vox, Fisher served in AOL's General Counsel's office as an attorney from approximately 2001 - 2007.

89.     In 1999, Kelly Hallissey and several other plaintiffs filed a nationwide FLSA collective action lawsuit on behalf of themselves and other "Community Leaders" against AOL,

alleging, *inter-alia*, AOL's failure to pay its Community Leaders minimum wages required by 29 U.S.C. § 206. *See* Case No. 99-CIV-3785 (S.D.N.Y.) ("*Hallissey*"); *Hallissey v. America Online, Inc*., 2006 U.S. Dist. LEXIS 12964 (S.D.N.Y., Mar. 10, 2006).

90.     The *Hallissey* case involved similar factual and legal issues as in the instant litigation: *i.e.*, the failure to classify those performing services for both defendants as "employees" under the FLSA, the failure of both defendants to ensure compliance with the FLSA's minimum wage requirements as it related to each of the plaintiffs, the overlapping or similarity in duties of AOL's CL's and Vox's Site Managers, including but not limited to: creating and editing online content, moderating online community interaction, and managing or assisting other content creators. *Id.* at *3-4. Plaintiffs in both actions were integral to the operation of the businesses of both defendants, and neither set of plaintiffs enjoyed the opportunity of profit or loss. In neither action did the positions in which plaintiffs worked require special skill or investment. In both actions the plaintiffs' work conditions and rates of pay were controlled by the defendants.

91.     The United States Department of Labor, Wage and Hour Division ("USDOL") conducted an investigation of AOL concerning the allegations in *Hallissey*.

92.     The *Hallissey* case was widely publicized in the media from its inception through settlement.[9]

93.     In 2000, AOL filed a motion to dismiss the *Hallissey* action under Fed. R. Civ. P.

---

[9] For example, *see*, "'Volunteer' Community Leaders Sue AOL for $20m," Computer Business Review, May 27, 1999, *available at:*
http://www.cbronline.com/news/volunteer_community_leaders_sue_aol_for_20m (last accessed 10/20/2017); "The Little People VS. America Online," Forbes, February 19, 2001, *available at:*
https://www.forbes.com/asap/2001/0219/060.html (last accessed 10/20/2017); "AOL Settled with Unpaid 'Volunteers' for $15 Million," Columbia Journalism Review, February 10, 2011, available at: http://archives.cjr.org/the_news_frontier/aol_settled_with_unpaid_volunt.php (last accessed 10/20/2017).

12(b)(1) under a jointly agreed upon discovery protocol, in which evidence relating to eleven (11) representative plaintiffs was evaluated, under the standards of Fed. R. Civ. P. 56.  *See Hallissey v. America Online, Inc.*, 2006 U.S. Dist. LEXIS 12964 (S.D.N.Y., Mar. 10, 2006) at *6-8.

94.     In moving to dismiss the *Hallissey* action, AOL contended that its Community Leaders were not "employees" within the meaning of the FLSA, but rather were "volunteers". *Id*.

95.     On March 10, 2006, the *Hallissey* Court, per Duffy, J., rejected AOL's volunteer defense and held that genuine issues of material fact existed as to whether the Community Leaders were AOL's employees within the meaning of the FLSA.  *Id.* at *10.

96.     On February 19, 2008, the *Hallissey* Court certified the action as a nationwide collective action.  *Hallissey v. America Online, Inc.*, 2008 WL 465112 (S.D.N.Y., Feb. 19, 2008).

97.     On December 21, 2009, the parties in *Hallissey* submitted a joint motion for preliminary approval of settlement in the amount of $15 Million, ECF No. 2651, which the *Hallissey* Court granted on February 2, 2010, ECF No. 2657.

98.     On April 29, 2010, the parties in *Hallissey* submitted a joint application for final approval of settlement in the amount of $15 Million, ECF No. 2666, which the *Hallissey* Court granted on May 25, 2010, ECF No. 2670.

99.     During their tenure at AOL, Bankoff, Moe and Fisher were well aware of the *Hallissey* case and the USDOL investigation.

100.    Fisher, as part of the General Counsel's office, received and was privy to legal advice from AOL's outside labor counsel concerning the *Hallissey* litigation.

101.    During all times relevant to this action, Bankoff, Moe and Fisher were aware of the $15 Million settlement and Judge Duffy's March 10, 2006 opinion in *Hallissey*.

102.    During all relevant times, Fisher was aware of and, indeed, advised Vox in relation to its decision to continually classify Plaintiffs and the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime required by law.

103.    Fisher signed the Blogger Agreements for Vox.  Exs. 1-3 at pp.3.

104.    During all relevant times, Bankoff and Moe were also aware of Vox's decision to classify the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime required by law.

105.    As senior executives of Vox, through their own acts and/or omissions, as well as those of their agents, Bankoff, Moe and Fisher were responsible for the decision to classify the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime pay required by law.

106.    In approximately late 2013, Plaintiff Bradley complained to her League Manager Travis Hughes that she was paid inadequate wages.  Hughes replied that wages were determined by team site traffic.  Bradley subsequently helped increase Mile High Hockey's site traffic significantly, yet her monthly salary never increased.

107.    Upon information and belief, Vox received complaints from other Site Managers concerning Vox's pay practices.[10]

---

[10] *See Supra* n. 1 ("I read [SB Nation editor-in-chief Elena] Bergeron and [general manager Kevin] Lockland's quotes to a few of the site managers. One site manager promptly cleaned up the water Bergeron and Lockland had muddied: I would guess that 50 percent of our content comes from folks not getting anything. [Our league manager] knows that — we talked about how to use unpaid writers … and I would be shocked if his bosses didn't know that.  And [Lockland's

108.     Given Vox's awareness of the *Hallissey* litigation, the related USDOL investigation, and internal complaints from Plaintiff Bradley and other Site Managers, Vox knew it was illegal to classify the FLSA Class Members as independent contractors and fail to ensure they were paid at least the minimum wage and overtime required by law.

109.     Despite its continuing knowledge of the illegality of these practices, Vox willfully and continually refused to pay the FLSA Class Members minimum wages and overtime due for hours worked, and thus a three-year statute of limitations is applicable to FLSA Class Members in this matter.  *See* 29 U.S.C. § 255(a); *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141–42 (2d Cir. 1999); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991); *Galloway v. Chugach Gov't Servs., Inc.*, 199 F. Supp. 3d 145, 151-153 (D.D.C. 2016).

110.     Vox does not maintain accurate records of the actual hours that Plaintiffs and FLSA Class Members worked each workday and the total hours worked each workweek as required by the FLSA.  *See* 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c) (requiring employers to maintain payroll records for three years and time sheets for two years, including the exact number of hours worked each day and each week).

111.     Vox knew or should have known that Plaintiffs and FLSA Class Members were employees and were not exempt from the FLSA's minimum wage or overtime requirements.

112.     Vox is a sophisticated multi-national business worth approximately $1 Billion. Vox has access to knowledgeable human resource specialists and competent labor counsel.

113.     Vox has acted willfully and with reckless disregard of clearly applicable FLSA

---

answer] seems like an attempt to **blur the lines between fanposts**, which are written and posted by fans with no oversight/editing by us (and thus are the way that most of the big screw-ups of the past have happened), **and actual unpaid contributors**, who write articles on a normal schedule that are edited and posted in the main layout. **Again, they have to know the difference between those roles, so I'm not sure if they're confused or trying to deliberately obfuscate the issue**.") (Emphasis added).

provisions by failing to compensate Plaintiffs and the FLSA Class with pay of at least $7.25 per hour, as required by 29 U.S.C. § 206(a).

114.   Vox has acted willfully and with reckless disregard of clearly applicable FLSA provisions by failing to compensate Plaintiffs and the FLSA Class for all hours worked in excess of forty (40) during the workweek at a rate of not less than one and one half (1.5) times the minimum wage, as required by 29 U.S.C. §§ 206(a), 207(a).

## COLLECTIVE ACTION ALLEGATIONS

115.   Plaintiffs bring this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Class defined above.

116.   Plaintiffs desire to pursue their claims on behalf of themselves and any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

117.   Plaintiffs and the FLSA Class are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, *inter alia*, all such individuals were misclassified as independent contractors, worked pursuant to Vox's previously described common pay practices and, as a result of such practices, were not paid the full and legally mandated minimum wage or overtime premiums for hours worked over forty (40) during the workweek.   Resolution of this action requires inquiry into common facts, including, *inter alia*, Vox's common compensation, timekeeping, and payroll practices.

118.   Specifically, Vox paid Plaintiffs and the FLSA Class on a monthly basis, but failed to pay Plaintiffs and the FLSA Class at least the minimum wage required by 29 U.S.C. § 206(a), and failed to pay overtime at time and a half (1 ½) the employee's regular rate (not to fall below $7.25 per hour) as required by the FLSA for all hours worked in excess of forty (40) per workweek.

119.    The similarly situated employees are known to Vox, are readily identifiable, and may be located through Vox business and human resource records.

120.    Vox employs many FLSA Class Members.  These similarly situated employees may be readily notified of this action through direct U.S. mail and/or other appropriate means, and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for overtime compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

**COUNT I**
**Minimum Wage Violation, 29 U.S.C. § 206(a)**
**<ins>(On Behalf of the FLSA Class)</ins>**

121.    All previous paragraphs are incorporated as though fully set forth herein.

122.    The FLSA requires that covered employees be compensated for all hours worked at a rate of not less than $7.25 per hour.  *See* 29 U.S.C. § 206(a)(1).

123.    Vox is subject to the wage requirements of the FLSA because Vox is an "employer" under 29 U.S.C. § 203(d).

124.    At all relevant times, Vox is an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

125.    During all relevant times, Plaintiffs and the FLSA Class are covered employees entitled to the above-described FLSA's protections.  *See* 29 U.S.C. § 203(e).

126.    Plaintiffs and the FLSA Class are not exempt from the requirements of the FLSA. Plaintiffs and the FLSA Class are entitled to be paid for all hours worked at a rate of not less than $7.25 per hour, pursuant to 29 U.S.C. § 206(a)(1).

127.    Vox's compensation scheme applicable to Plaintiffs and the FLSA Class failed to

24

comply with 29 U.S.C. § 206(a)(1).

128.    Vox knowingly failed to compensate Plaintiffs and the FLSA Class for all hours worked at a rate of not less than $7.25 per hour, in violation of 29 U.S.C. § 206(a)(1).

129.    Vox also failed to make, keep, and preserve records with respect to Plaintiffs and the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in violation of the FLSA.  29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

130.    In violating the FLSA, Vox acted willfully and with reckless disregard of clearly applicable FLSA provisions.

131.    Pursuant to 29 U.S.C. § 216(b), employers such as Vox, who intentionally fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

## COUNT II
## Overtime Violation, 29 U.S.C. § 207(a)
## (On Behalf of the FLSA Class)

132.    All previous paragraphs are incorporated as though fully set forth herein.

133.    The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which they are employed, not to fall below 1 ½ times the minimum wage.  *See* 29 U.S.C. §§ 206(a)(1), 207(a)(1).

134.    Vox is subject to the wage requirements of the FLSA because Vox is an "employer" under 29 U.S.C. § 203(d).

135.    At all relevant times, Vox is an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §

203.

136.     During all relevant times, Plaintiffs and the FLSA Class are covered employees entitled to the above-described FLSA's protections.  *See* 29 U.S.C. § 203(e).

137.     Plaintiffs and the FLSA Class are not exempt from the requirements of the FLSA. Plaintiffs and the FLSA Class are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant, not to fall below 1 ½ times the minimum wage.  *See* 29 U.S.C. §§ 206(a)(1), 207(a)(1).

138.     Vox's compensation scheme applicable to Plaintiffs and the FLSA Class failed to comply with 29 U.S.C. §§ 206(a)(1), 207(a)(1).

139.     Vox knowingly failed to compensate Plaintiffs and the FLSA Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, not to fall below 1 ½ times the minimum wage, in violation of 29 U.S.C. §§ 206(a)(1), 207(a)(1).

140.     Vox also failed to make, keep, and preserve records with respect to Plaintiffs and the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in violation of the FLSA.  29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

141.     In violating the FLSA, Vox acted willfully and with reckless disregard of clearly applicable FLSA provisions.

142.     Pursuant to 29 U.S.C. § 216(b), employers such as Vox, who intentionally fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief on behalf of themselves and all others similarly situated:

    a. An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

    b. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Class members;

    c. Back pay damages (including unpaid minimum wages and overtime compensation) and prejudgment interest to the fullest extent permitted under the law;

    d. Liquidated damages to the fullest extent permitted under the law;

    e. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

    f. Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all issues of fact.

Dated:   October 23, 2017

Respectfully Submitted,

_James E. Goodley_

James E. Goodley (Bar. No. PA0069)
Judith Sznyter (Bar No. 982325)
Stephen J. Holroyd*
Marc. L. Gelman*
JENNINGS SIGMOND, P.C.
1835 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 351-0613/0641/0670/0623
jgoodley@jslex.com
jsznyter@jslex.com
sholroyd@jslex.com
mgelman@jslex.com

*Attorneys for Plaintiffs and the FLSA Class*
*\* Admitted Pro Hac Vice*