# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
CHERYL C. BRADLEY, *et al.*, for            )
themselves and on behalf of all persons     )
similarly situated,                         )
                                            )
       Plaintiffs,              )
                                            )
    v.                               )    Case No. 1:17-cv-01791 (RMC)
                                            )
VOX MEDIA, INC., d/b/a SB NATION,           )
                                            )
       Defendant.               )
_____             )

## DEFENDANT VOX MEDIA, INC.'S ANSWER TO
## PLAINTIFFS' FIRST AMENDED COLLECTIVE ACTION COMPLAINT

NOW COMES Defendant Vox Media, Inc. ("Defendant" or "Vox Media"), by and through its undersigned attorneys, hereby respectfully answers the allegations in Plaintiffs' First Amended Collective Action Complaint ("FAC") and states as follows:

## GENERAL DENIAL

Except as otherwise specifically and expressly admitted herein, Vox Media denies each and every allegation contained in the FAC, including, without limitation, any allegations contained in the preamble, headings, subheadings, or footnotes (which have been reproduced herein) of the FAC, and specifically denies any liability to Plaintiffs. Vox Media expressly reserves the right to seek to amend or supplement its Answer as may be necessary.

## ANSWERS TO SPECIFIC ALLEGATIONS IN PLAINTIFFS' FAC

## ANSWERS TO "JURISDICTION AND VENUE" ALLEGATIONS

1.    Jurisdiction over Plaintiff's FLSA claims is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

**ANSWER**:     Paragraph 1 contains Plaintiffs' jurisdictional allegations, to which no response is required.  To the extent a response is required, Defendant admits that this Court has jurisdiction over the subject matter of Plaintiffs' claims and otherwise denies the allegations in Paragraph 1.

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391. Defendant is headquartered in this District.  The events giving rise to Plaintiff's claims occurred within this District, and Defendants conduct business in this District.

**ANSWER**:     Paragraph 2 contains legal assertions regarding venue, to which no response is required.  To the extent a response is required, Vox Media admits that it has a corporate office in Washington D.C. and conducts business therein and otherwise denies the allegations in Paragraph 2.

## ANSWERS TO "PARTIES" ALLEGATIONS

3.      Plaintiff Cheryl C. Bradley ("Bradley") is an individual currently residing in Centennial, Colorado.  She was employed by Defendant as a Site Manager (otherwise known as a Managing Editor) from on or about June 2013 through on or about February 2015, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action.  See ECF No. 1, Ex. A.

**ANSWER**:  Vox Media admits that Plaintiff Bradley's "consent form" was submitted as Exhibit A to the original Complaint in this action.  Vox Media lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiff Bradley's allegation regarding her current residence and, on that basis, denies it.   The remaining allegations in Paragraph 3 state legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 3.

4.      Plaintiff John M. Wakefield ("Wakefield") is an individual currently residing in Charlotte, North Carolina.  He was employed by Defendant as a Site Manager from on or about December 2015 through on or about May 2017, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action. See ECF No. 15.

**ANSWER**:  Vox Media admits that Plaintiff Wakefield's "consent form" was submitted as docket number 15.  Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of Plaintiff Wakefield's allegations regarding his current residence and, on that basis,

denies it.  The remaining allegations in Paragraph 4 state legal conclusions to which no response

is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph

4.

5.     Plaintiff Maija Liisa Varda ("Varda" and collectively with Bradley and Wakefield, "Plaintiffs") is an individual currently residing in Minneapolis, Minnesota.  She has been employed by Defendant as a Site Manager from on or about May 2016 through the present, and, pursuant to 29 U.S.C. § 216(b), has consented in writing to being a Plaintiff in this action.  See ECF No. 9.

**ANSWER**:  Vox Media admits that Plaintiff Varda's "consent form" was submitted as docket

number 9.  Vox Media lacks knowledge or information sufficient to form a belief as to the truth or

falsity of Plaintiff Varda's allegations regarding her current residence and, on that basis, denies it.

The remaining allegations in Paragraph 5 state legal conclusions to which no response is required.

To the extent a response is required, Vox Media denies the allegations in Paragraph 5.

6.     Defendant Vox Media, Inc., d/b/a SB Nation ("Vox") is a Delaware corporation headquartered in the District of Columbia, and operating nationwide. Vox maintains hundreds of sports websites affiliated with its business division known as "SB Nation."

**ANSWER**:  Vox Media admits that it owns, under its SB Nation brand, a network of hundreds of

sports websites devoted to professional and college sports teams.  Vox Media further admits that

it is incorporated in Delaware and that it has a corporate headquarters in the District of Columbia.

Vox Media otherwise denies the remaining allegations in Paragraph 6.

7.     Defendant employs individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206- 207.

**ANSWER**:  Paragraph 7 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media admits that it employs certain individuals engaged in

commerce or in the production of goods for commerce and/or handling, selling, or otherwise

working on goods or materials that have been moved in or produced in commerce by any person.

Vox Media denies the allegations as to Plaintiffs and denies that Vox Media is Plaintiffs' employer.

8.       Defendant's annual gross volume of business exceeds $500,000.

**ANSWER**:  Vox Media admits that its annual gross revenue exceeds $500,000.

## ANSWERS TO "CLASS DEFINITIONS" ALLEGATIONS

9.       Plaintiffs bring Counts I and II of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b) as a collective action on behalf of themselves and the following class of potential opt-in litigants:

> All current or former Site Managers and Managing Editors who performed work in the United States for Vox Media, Inc. in its SB Nation business division within the past three years (the "FLSA Class").

**ANSWER**:  Vox Media admits that Plaintiffs purport to bring their claims under the FLSA as an

opt-in collective action pursuant to 29 U.S.C. § 216(b).  Vox Media further admits that Plaintiffs

seek to represent an FLSA collective as set forth in Paragraph 9.  Vox Media denies that Plaintiffs

may legally maintain a collective action against Vox Media and that Plaintiffs are entitled to the

relief sought in this action.   Vox Media denies the remaining allegations of Paragraph 9.

10.       Plaintiffs reserve the right to redefine the FLSA Class prior to notice or class certification, and thereafter, as necessary.

**ANSWER**:  Vox Media admits that Plaintiffs purport to reserve the right to redefine the collective

of individuals they seek to represent on a class basis.  Vox Media denies that Plaintiffs may legally

maintain a collective action against Vox Media and reserves the right to contest any attempt by

Plaintiffs to redefine the collective in the future.

## ANSWERS TO "FACTS" ALLEGATIONS

11.     Defendant Vox, is a media corporation which operates and maintains media websites, including approximately 319 sports websites affiliated with its business division known as SB Nation.

**ANSWER**:  Vox Media admits that it is a media corporation that owns approximately 300 sports

websites under its SB Nation network.  Vox Media otherwise denies the allegations in Paragraph

11.

12.     On August 14 and 15, 2017, the sports website Deadspin published a pair of articles revealing Vox's treatment of its Site Managers and other content creator employees, which included negative feedback from many such employees concerning Vox's pay practices.[1]

**ANSWER**:  Vox Media admits that two articles were published on deadspin.com on August 14

and 15, 2017 that related to Vox Media and SB Nation and are available at the URLs provided in

footnote 1 of the FAC.  Vox Media otherwise denies the allegations in Paragraph 12, including to

the extent, if any, that Plaintiffs seek to incorporate the content of those articles into the FAC.

13.     On or about June 1, 2013, Bradley signed a "Blogger Agreement," attached hereto as Exhibit 1, which to the extent lawful, governed the terms of the relationship between Bradley and Vox.

**ANSWER**:  Paragraph 13 purports to describe a document filed as Exhibit 1 to the FAC.  Vox

Media respectfully refers the Court to such document, which speaks for itself.  Vox Media

otherwise denies the allegations in Paragraph 13.

14.     From approximately June 2013 through February 2015, Bradley served as a Site Manager for Vox's "Mile High Hockey" website.

---

[1]  *See* "How SB Nation Profits Off an Army of Exploited Workers," *available at*:  http://deadspin.com/how-sb-nation-profits-off-an-army-of-exploited-workers-1797653841 (last accessed October 11, 2017); "SB Nation Bosses, Current And Former Workers Discuss Pay,Management, And More In Emails And Leaked Memos," *available at*:  http://deadspin.com/sb- nation-bosses-current-and-former-workers-discuss-pa-1797868635 (last accessed October 11, 2017).

**ANSWER**:     Vox Media admits that it contracted with Plaintiff Bradley to perform work as Site

Manager of the Mile High Hockey website from approximately June 2013 through approximately

February 2015.  Vox Media otherwise denies the allegations in Paragraph 14.

15.     Bradley's Blogger Agreement obligated her to create content to place on Vox's SB
Nation website known as Mile High Hockey.[2] Ex. 1, Blogger Agreement at A-1.

**ANSWER**:     Paragraph 15 purports to describe a document filed as Exhibit 1 to the FAC.  Vox

Media respectfully refers the Court to such document, which speaks for itself.  Vox Media

otherwise denies the allegations in Paragraph 15.

16.     Mile High Hockey is SB Nation's website for the Colorado Avalanche, a
professional ice hockey team, which is part of the National Hockey League ("NHL").

**ANSWER**:     Vox Media admits the allegations in Paragraph 16.

17.     During all times relevant to this action, Travis Hughes served as SB Nation's
"League Manager" for all of its NHL team sites, including Mile High Hockey. Hughes' role was
to supervise all NHL Site Managers at Vox, including Bradley.

**ANSWER**:     Vox Media denies the allegations in Paragraph 17, except to state that Travis

Hughes served as NHL League Manager from approximately early 2010 through approximately

April 2018.

18.     During Bradley's employment at Vox, among other duties, Bradley regularly
watched Avalanche games, wrote and published approximately five or six articles per week (more
during peak times), managed other writers (which included relaying Vox directives from Travis
Hughes), edited and approved new writers' articles, monitored search engine optimization data,
and managed comment sections and Fan Post articles on the Mile High Hockey website.

**ANSWER**:     Vox Media denies the allegations in Paragraph 18.

19.     Bradley also managed Mile High Hockey's Facebook and Twitter social media
accounts. On both accounts, Bradley would share links to Mile High Hockey articles, as well as
Avalanche team information including:  transactions, special events, and other information
provided by the Avalanche's media relations department. Bradley "live Tweeted" during games,
practices, and training camps in order to give readers play-by-play information about the team's

---

[2]  https://www.milehighhockey.com/ (last accessed 8/31/2017)

performance. Finally, Bradley would remove any objectionable content on both the Facebook and Twitter feeds.

**ANSWER**:     Vox Media admits that, as Site Manager for Mile High Hockey, Plaintiff Bradley

made contributions to Mile High Hockey's social media platforms.  Vox Media lacks knowledge

or information sufficient to form a belief as to the truth or falsity of the remaining allegations in

Paragraph 19 and, on that basis, denies them.

20.     While Site Manager, Bradley regularly worked thirty (30) to forty (40) hours per week, and was compensated at a rate of $125 per month.

**ANSWER**:     Vox Media admits that Plaintiff Bradley received $125 per month as a contractor

pursuant to the terms of her agreement.  Vox Media denies the remaining allegations in Paragraph

20.

21.     On an annual basis, during peak times, such as near the NHL draft, trade and free-agency deadlines, training camps, pre-season (which occurred in late September and early October), or when Bradley was understaffed, Bradley worked in excess of forty (40) hours per week, and as much as fifty (50) hours per week.

**ANSWER**:     Vox Media denies the allegations in Paragraph 21.

22.     On or about January 1, 2016, Wakefield signed a "Blogger Agreement," substantially similar to Bradley's and Varda's, attached hereto as Exhibit 2, which to the extent lawful, governed the terms of the relationship between Wakefield and Vox.

**ANSWER**:     The allegations in Paragraph 22 purport to describe a document filed as Exhibit 2

to the FAC.  Vox Media respectfully refers the Court to such document, which speaks for itself.

To the extent any further response is required, Vox Media otherwise denies the allegations in

Paragraph 22.

23.     From approximately December 2015 through May 2017, Wakefield served as a Site Manager for Vox's "Through It All Together," website.

**ANSWER**:     Vox Media admits that it contracted with Plaintiff Wakefield to perform work as

Site Manager of the Through It All Together website from approximately January 2016 through

approximately May 2017.  Vox Media otherwise denies the allegations in Paragraph 23.

24.     Wakefield's Blogger Agreement obligated him to create content to place on Vox's
SB Nation website known as Through It All Together.[3] Ex. 2, Blogger Agreement at A-1.

**ANSWER**:     The allegations in Paragraph 24 purport to describe a document filed as Exhibit 2

to the FAC.  Vox Media respectfully refers the Court to such document, which speaks for itself.

To the extent any further response is required, Vox Media otherwise denies the allegations in

Paragraph 24.

25.     Through It All Together is SB Nation's website for Leeds United Football Club
("Leeds United"), an English professional soccer team.

**ANSWER**:     Vox Media admits the allegation in Paragraph 25.

26.     During all times relevant to this action, Jeremiah Oshan served as SB Nation's
"League Manager" for all of its soccer team sites, including Through It All Together. Oshan's role
was to supervise all soccer Site Managers at Vox, including Wakefield.

**ANSWER**:     Vox Media denies the allegations in Paragraph 26, except to admit that Jeremiah

Oshan served as soccer League Manager (or under a different title but in a similar role) from

approximately July 2014 through present.

27.     During Wakefield's employment at Vox, among other duties, Wakefield regularly
watched or listened to Leeds United games, personally wrote and published between
approximately one (1) and three (3) articles per week, managed other writers (including by relaying
Vox directives from Jeremiah Oshan), edited and approved between two (2) and five (5) articles
written by the site's staff writers, monitored search engine optimization data, and managed
comment sections and Fan Post articles on the Through It All Together website.

**ANSWER**:     Vox Media denies the allegations in Paragraph 27 except to state that, on average

throughout his contractual term as Site Manager, approximately one to two "posts" per week were

posted to the Through It All Together website under Plaintiff Wakefield's account credentials.

---

[3]   https://throughitalltogether.sbnation.com/ (last accessed 10/10/2017)

28.     Wakefield grew Through It All Together's Twitter account to over 4,500 followers, which significantly increased Through It All Together's web site traffic.

**ANSWER**:     Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 28 and, on that basis, denies them.

29.     Wakefield created a second Through It All Together Twitter account, for live-tweeting during games. Wakefield grew this account to over 1,800 followers, which further increased Through It All Together's web site traffic.

**ANSWER**:     Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 29 and, on that basis, denies them.

30.     While Site Manager, Wakefield regularly worked thirty (30) to forty (40) hours per week, and was compensated at a flat monthly rate. Vox initially paid Wakefield $50 per month, and later increased his pay to $75 per month.

**ANSWER**:     Vox Media admits that, as a Site Manager, Plaintiff Wakefield received varying

levels of pay from Vox Media, including $50 per month and $75 per month.  Vox Media denies

the remaining allegations in Paragraph 30.

31.     On an annual basis, during the soccer season, as well as during peak news generating periods during the off-season, such as the Transfer Window period, Wakefield often worked in excess of forty (40) hours per week, and as much as sixty (60) hours per week.

**ANSWER**:     Vox Media denies the allegations in Paragraph 31.

32.     On or about May 1, 2016, Varda signed a "Blogger Agreement," substantially similar to Bradley's and Wakefield's, attached hereto as Exhibit 3, which to the extent lawful, governed the terms of the relationship between Varda and Vox.

**ANSWER**:     Paragraph 32 purports to describe a document filed as Exhibit 3 to the FAC.  Vox

Media respectfully refers the Court to such document, which speaks for itself.  To the extent

Paragraph 32 contains legal conclusions, no response is required.  Vox Media otherwise denies the

allegations in Paragraph 32.

33.     From approximately May 2016 through present, Varda has served as a Site Manager for Vox's "Twinkie Town," website.

**ANSWER**:     Vox Media admits that it has contracted with Plaintiff Varda to perform work as Site Manager of the Twinkie Town website since approximately May 2016.  Vox Media otherwise denies the allegations in Paragraph 33.

34.     Varda's Blogger Agreement obligated her to create content to place on Vox's SB Nation website known as Twinkie Town.[4]  Ex. 3, Blogger Agreement at A-1.

**ANSWER**:     To the extent the allegations in Paragraph 34 purport to describe a document filed as Exhibit 3 to the FAC, Vox Media respectfully refers the Court to such document, which speaks for itself.  To the extent the allegations in Paragraph 34 contain legal conclusions, no response is required.   To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 34.

35.     Twinkie Town is SB Nation's website for the Minnesota Twins, a professional baseball team, which is part of Major League Baseball ("MLB").

**ANSWER**:     Vox Media admits the allegation in Paragraph 35.

36.     During all times relevant to this action, Justin Bopp served as SB Nation's "League Manager" for all of its MLB team sites, including Twinkie Town. Bopp's role was to supervise all MLB Site Managers at Vox, including Varda.

**ANSWER**:     Vox Media denies the allegations in Paragraph 36, except to admit that Justin Bopp served as MLB League Manager from approximately February 2013 through approximately October 2017.

37.     During Varda's employment at Vox, among other duties, Varda regularly wrote daily general interest articles about the Twins, reported breaking Twins news in a timely fashion, performed historical and statistical research, wrote series previews, managed a team of other Twinkie Town staff writers ranging from about six (6) to twelve (12) in number, wrote or scheduled daily game coverage and recaps of Twins games, coordinated coverage schedules among staff writers, edited and provided feedback on staff writer articles, contacted staff writers to address specific concerns, communicated with Justin Bopp and relayed Vox directives to staff writers, monitored the Twinkie Town comment section to encourage community participation and remove objectionable content, managed all aspects of the Twinkie Town Facebook page and Twitter feeds, actively searched for and recruited new writers, reviewed resumes and writing samples of prospective writers, and trained new writers on best practices.

---

[4]  https://www.twinkietown.com/ (last accessed 10/10/2017)

**ANSWER**:   Vox Media denies the allegations in Paragraph 37.

38.   Vox required Varda to publish several articles on Twinkie Town per day, whether written by her or Twinkie's Town's staff writers.

**ANSWER**:   To the extent the allegations in Paragraph 38 purport to describe a document filed as Exhibit 3 to the FAC, Vox Media respectfully refers the Court to such document, which speaks for itself.   To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 38.

39.   Varda personally authored an average of approximately two (2) articles per day, and edited on average approximately two (2) articles per day, which were first drafted by Twinkie Town's staff writers.

**ANSWER**:   Vox Media denies the allegations in Paragraph 39.

40.   While Site Manager, Varda regularly worked thirty (30) to forty (40) hours per week, and was compensated at a rate of $400 per month.

**ANSWER**:   Vox Media admits that, as a Site Manager, Plaintiff Varda has received varying levels of pay from Vox Media, including $400 per month and $450 per month.   Vox Media denies the remaining allegations in Paragraph 40.

41.   During peak times, such as near MLB trade, draft and free-agency deadlines, playoffs, MLB All Star game week, Winter Meetings or when Varda was understaffed, Varda often worked in excess of forty (40) hours per week, and as much as fifty (50) hours per week.

**ANSWER**:   Vox Media denies the allegations in Paragraph 41.

### ANSWERS TO "EMPLOYMENT RELATIONSHIP" ALLEGATIONS

42.   Federal courts weigh several non-exclusive factors in order to determine whether, as a matter of "economic reality," an employment relationship exists. *See, e.g., Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) ("we ask 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" (Citation omitted; quoting *Henthorn v. Department of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994)). "Depending on the circumstances, the inquiry should not be limited to these factors." *Ivanov v. Sunset Pools Mgmt. Inc.*, 567 F. Supp. 2d 189, 194 (D.D.C. 2008).

**ANSWER**:     Paragraph 42 contains statements of law and legal conclusions to which no response

is required.  Vox Media respectfully refers the Court to the referenced case law for a full and

complete statement of its content.  Vox Media denies the remaining allegations in Paragraph 42.

43.     In *Donovan v. DialAmerica Mktg., Inc*., 757 F.2d 1376, 1382 (3d Cir. 1985) the
Court of Appeals for the Third Circuit considered the following factors:

> 1)  the degree of the alleged employer's right to control the manner in which the
> work is to be performed;
> 2)  the alleged employee's opportunity for profit or loss depending upon his
> managerial skill;
> 3)  the alleged employee's investment in equipment or materials required for his
> task, or his employment of helpers;
> 4)  whether the service rendered requires a special skill;
> 5)  the degree of permanence of the working relationship;
> 6)  whether the service rendered is an integral part of the alleged employer's
> business.

**ANSWER**:     Paragraph 43 contains statements of law and legal conclusions to which no response

is required.  Vox Media respectfully refers the Court to the referenced case law for a full and

complete statement of its content.  Vox Media denies the remaining allegations in Paragraph 43.

44.     Vox, per League Manager Travis Hughes, interviewed Bradley for employment as
Site Manager for Mile High Hockey. On behalf of Vox, Mr. Hughes hired Bradley as Site Manager.

**ANSWER**:     Vox Media denies the allegations in Paragraph 44.

45.     On one occasion on or about February 2015, a staff writer for Mile High Hockey
wrote an article which expressed that Vox branded each of its business divisions in specific ways
to advertisers, and defined the target audience on its SB Nation sites as being men only. The staff
writer thus expressed the opinion that Vox's branding was misogynistic and ignored the female
presence on SB Nation's sites, such as female staff or female site visitors. Without consulting
Bradley, NHL League Manager Hughes immediately deleted the post and banned the staff writer
from SB Nation.

**ANSWER**:     Vox Media admits that, in 2015, a Mile High Hockey contributor wrote an article

regarding SB Nation's readership and target audience.  Vox Media otherwise denies the allegations

in Paragraph 45.

46. Bradley later defended the staff writer to Mr. Hughes. Less than one week later, Hughes fired Bradley from her position as Site Manager under false pretexts, revoking all editorial and authoring access to the Mile High Hockey website without advanced warning.

**ANSWER**: Vox Media admits that Plaintiff Bradley and Vox Media ended their contractual relationship and that her editorial access to the site was thereafter revoked. Vox Media otherwise denies the remaining allegations in Paragraph 46.

47. On or about December 10, 2015, Wakefield applied for the position of Site Manager for Through It All Together by contacting Vox Soccer League Manager Jeremiah Oshan. Mr. Oshan interviewed Wakefield for the position and, on behalf of Vox, hired Wakefield as Site Manager.

**ANSWER**: Vox Media denies the allegations in Paragraph 47.

48. On or about April 2016, Varda applied for the position of Site Manager for Twinkie Town, in response to a Vox job posting.

**ANSWER**: Vox Media admits the allegation in Paragraph 48.

49. Vox MLB League Manager Justin Bopp interviewed Varda for the position. On behalf of Vox, Mr. Bopp hired Varda as Site Manager.

**ANSWER**: Vox Media admits that Justin Bopp communicated with Plaintiff Varda regarding her potential contractual relationship with Vox Media. Vox Media otherwise denies the allegations in Paragraph 49.

50. Vox advertised open positions for SB Nation's Site Managers, often in the same or similar manner as Vox advertisements for paid positions that Vox classified as employee positions.[5] For example, a posting for Site Managers of SB Nation's Detroit Pistons website "Detroit Bad Boys" is reproduced herein[6]:

---

[5] https://www.voxmedia.com/pages/careers-jobs (last accessed 10/13/2017)
[6] *Supra*, n.1

**Managing Editor, Detroit Bad Boys (Detroit Pistons)**

at Vox Media (View all jobs)

Remote

Vox Media's SB Nation is the fastest-growing online sports media brand and the largest network of more than 300 individual fan-centric sports communities, including SBNation.com, our national flagship property. Our network is powered by the most respected web-native sports journalists. One part of our network needs a new steady hand, and that's where you come in.

**Detroit Bad Boys**, the SB Nation blog covering the **Detroit Pistons**, is looking for a new manager.

The perfect candidate can express her or his thoughts about the team and the sport in a consistently engaging way. Hopefully you're as big of a nerd about the Internet, social media and sports journalism as you are about the Pistons. You should have experience managing people, the ability to delegate and an insatiable desire to discover and produce work that Pistons fans love.

**Responsibilities:**

- Write, edit and ensure regular publication of quality  writing / video content.
- Manage a diverse team of writers.
- Operate the site's Facebook page, Twitter account and other social media channels.
- Communicate regularly with SB Nation management about site goals, traffic analysis and progress.
- Shape the editorial direction of Detroit Bad Boys.

**Requirements:**

- Obsessive knowledge of and passion for the Detroit Bad Boys and the NBA.
- You're a great writer, communicator and manager.
- You're experienced with web publishing tools (or you're a quick learner).
- You take pride in what you do.

**This is a contractor position that pays a small monthly stipend**. Some daytime availability is preferred.

**ANSWER**:      Vox Media admits that it advertises open positions for SB Nation Site Managers, as well as a variety of other independent contractor positions with Vox Media at the URL provided in footnote 5.  Vox Media further admits that it advertises open positions for a variety of employee positions at Vox Media at the URL provided in footnote 5.  Vox Media further admits that the screenshot provided in Paragraph 50 is included in the deadspin.com web article available at the URL provided in footnote 1.  Vox Media otherwise denies the allegations in Paragraph 50, including to the extent that Plaintiffs intend to incorporate any content from the screenshot provided into the factual allegations.

51.     Vox utilized its pool of Site Managers as a means by which to hire salaried writers whom *it classified* as "employees" under the FLSA. However, only a small fraction of Site Managers ever became salaried writers classified as "employees" within SB Nation.

**ANSWER**:     Vox Media denies the allegations in Paragraph 51, except to state that Vox Media

has, on occasion, hired then-current or former Site Manager independent contractors into separate

employment positions with other responsibilities (e.g., writing or editing content for SB Nation's

flagship site, sbnation.com).

52.     Vox maintained control over the manner in which Plaintiffs performed their services.

**ANSWER**:     Paragraph 52 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 52.

53.     Vox required Plaintiffs, whether personally or through the supervision of their staff writers, to cover each of the Colorado Avalanche, Leeds United, and Minnesota Twins games, respectively, and "post a post-game/event commentary/recap, ideally immediately following the completion of any game/event, but in all cases within six (6) hours of the end of each game/event (including pre-season and post-season), or no later than 9 a.m. Eastern Time the morning following the game/event, whichever is earlier." Exs. 1-2, Blogger Agreement at A-1; Ex. 3, Blogger Agreement at A-1 (similar).

**ANSWER**:     To the extent the allegations in Paragraph 53 purport to describe documents filed

as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak

for themselves.  To the extent any further response is required, Vox Media otherwise denies the

allegations in Paragraph 53.

54.     Plaintiffs regularly watched games and wrote recaps and previews for the Avalanche, Leeds United, and Twins games.

**ANSWER**:     Vox Media admits that Plaintiffs posted game previews and recaps on their

respective team sites under their site credentials.  Vox Media lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 54

and, on that basis, denies them.

55.     Despite the fact that the Blogger Agreement purported to allow Plaintiffs "editorial control over the Work Product," Vox maintained complete authority to "edit any Work Product, add content to the Site, and/or take down any Work Product or the Site in its entirety, within [its] reasonable business judgment." Exs. 1-3, Blogger Agreement at ¶ 3(d).

**ANSWER**:    To the extent the allegations in Paragraph 55 purport to describe documents filed as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak for themselves.   To the extent the allegations in Paragraph 55 contain legal conclusions, no response is required.   To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 55.

56.     On occasion, Vox actually exercised its control to edit the work product of Site Managers, for example when content was deemed to be controversial.

**ANSWER**:    Vox Media admits that, on some rare occasions, SB Nation League Managers have edited posts, for example when posts contain inappropriate profanity and when Plaintiff Varda posted a tweet on her site's official Twitter stating that she hoped MLB player Aaron Judge gets cancer.   Vox Media otherwise denies the allegations in Paragraph 56.

57.     Vox retained "exclusive control and decision-making authority regarding any and all revenue-generating opportunities with respect to the Site." Exs. 1-3, Blogger Agreement at ¶ 3(e).

**ANSWER**:    To the extent the allegations in Paragraph 57 purport to describe documents filed as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak for themselves.   To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 57.

58.     For purposes of enhancing SB Nation's web search rankings, and therefore its advertising revenue, Plaintiffs were required to add certain search terms to their articles, title articles in a certain way, and write at least 150 words in each article.

**ANSWER**:    Vox Media denies the allegations in Paragraph 58.

59.     While employed by Vox, Plaintiffs were <u>prohibited</u> from providing writing or editing services to competitors of SB Nation, including, but not limited to, Bleacher Report and ESPN. Exs. 1-3, Blogger Agreement at ¶ 7.

**ANSWER**:     To the extent the allegations in Paragraph 59 purport to describe documents filed

as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak

for themselves.   To the extent any further response is required, Vox Media otherwise denies the

allegations in Paragraph 59 and states that, in practice, certain Site Managers were not prohibited

from providing writing or editing services to competitors.

60.     On an ongoing basis, Vox required Plaintiffs to watch training videos, in their capacity as Site Managers at SB Nation.

**ANSWER**:     Vox Media denies the allegations in Paragraph 60.

61.     Deadspin published a leaked memo from SB Nation NBA League Manager Seth Pollack to his Site Managers, stating in part that "all writer contributors will be asked to sign new contracts specifying that **they will only get paid if they reach their target number of posts in a given month**":

> Over the years our little network of 33 sites covering the NBA, the WNBA and NCAAWB, and the D-league has grown and changed a lot. When we started blogging in the mid-2000's it was a one strong voice per site kind of world. We've since expanded our coverage, voices and methods to provide team fans with the best source of the information they crave.
>
> Someone recently said about ESPN: "They cover sports a mile wide and an inch deep. They do not align with sports fans' passions and don't give most sports, athletes, and fans the coverage they need and deserve." We are the opposite of that. We cover our teams with depth, passion and detail that is unmatched in the digital sports marketplace.
>
> Fans have rewarded our approach and your dedication with hundreds of millions of visits, tens of thousands of comments, and over a decade of support. Unfortunately, after a year of flat traffic we're seeing a troubling decline. We've also been flat since 2012 in the amount of content we produce despite annual increases in our budget.
>
> It's time to tweak a few things about how we do business.

### 1.    How we pay contributors

**Background**: We've traditionally paid contributors on a fixed monthly stipend. In our contract we ask for X amount of posts per week. But we now have over 120 paid folks and it's simply not possible to monitor and follow up on those that aren't meeting their contractual targets.

**Change**: All writer contributors will be asked to sign new contracts specifying that they will only get paid if they reach their target number of posts in a given month. Typically, we've asked for four posts per week but we'll review each person's situation with the site manager.

**Keys to Execution**: Site managers will need to review their paid staff and work with the league manager to determine the right target and pay level for each paid staff member. We'll notify contributors at least 30 days prior to the change and get them new contracts. At the end of each month, the league manager will review the list of paid contributors and compare their target to their actual results and pay those that meet the goal.

Note: I believe as a result of this change we'll be able to open up more paid writing positions. We'll watch and see how things play out over the first few months and we may try a few pilot programs at select sites to test various options for creating more paid positions.

### 2.    Create three site "tiers" and increase the budget and expectations for Tier 1 sites

**Background:** Since 2012 we've tried a variety of methods to increase the number of articles we produce without success and we're actually down about 14% in the first four months of 2017. Our goal is to increase the amount of content we produce by putting more money in the top sites that get the most traffic for each post.

**Change:** We create three site "tiers". The Tier 1 sites will have enough budget to meet a goal of five posts per day (in-season average) and meet other site management targets. Tier 2 and 3 sites will see no change to their budget and will have posting goals appropriate for their size.

**Keys to Execution:** After determining which sites are in which tiers we'll work with the Tier 1 site managers to review staff and budget and come up with individual plans to make any personnel changes needed to meet the goals.

3.    **Update the monthly incentive program**

**Background:** We launched the monthly incentive program about four years ago and we now have three different monthly targets that each "pay out" $100 if met. The impact of these incentives has diminished over time and need to be updated.

**Change:** Starting on August 1, we will have one monthly incentive program for site managers. The metric will be Posts Per Day with specific targets set based on tier level and adjusting during the off-season months of August and September. The incentive will be 25% of the site manager's base stipend amount so that if the target is reached in a given month the manager will receive their full stipend. If the target is not met they will receive 75% of their stipend amount.

Facebook posting and Facebook Live shows will be treated as specific site positions where contributors will be paid based on meeting targets just as contributing writers.

**Execution:** The league manager will set and communicate PPD targets for each tier and work with site managers to identify staff members for the the Facebook roles.

*Supra*, n.1 at Laura Wagner comment, 8/14/17 5:47pm. (Emphasis added).

**ANSWER**:    Vox Media admits that the screenshot included in Paragraph 61 is also included in the comment section of the deadspin.com web article available at the URL provided in footnote 1. Vox Media further admits that Seth Pollack distributed that text to certain Site Managers.  Vox Media otherwise denies the allegations in Paragraph 61, including to the extent that Plaintiffs intend to incorporate the content of the screenshot as allegations in the FAC.

62.    The leaked memo demonstrates that in order to maximize ad revenue,[7] Vox attempted to monitor and control its contributors' and Site Managers' posting volume to ensure

---

7   The vast majority of SB Nation's web traffic, and therefore advertising revenue, came from Team Sites managed by Site Managers, rather than from sbnation.com. *See* "Leaked Data Show Vast Majority Of SB Nation Page Views Come From Team Sites," *available at*:  https://deadspin.com/leaked-data-show-vast-majority-of-sb-nation-page-views-1803138754 (last accessed October 11, 2017).

compliance with "contractual targets," by threatening not to pay its Site Managers unless the targets were met.

**ANSWER**:   Vox Media denies the allegations in Paragraph 62.

63.   For the purpose of increasing its ad revenue, and despite the fact that Site managers never shared in such revenue, Vox regularly encouraged and pressured its Site Managers to meet content posting goals and requirements.

**ANSWER**:   Vox Media admits that it has encouraged its contractors to meet the expectations

set out in their respective contracts.  Vox Media admits that it provides Site Managers with best

practices on search engine optimization that the contributors can use or reject as they see fit.  Vox

Media otherwise denies the allegations in Paragraph 63.

64.   Vox terminated Varda's predecessor, Jesse Lundt, because Mr. Lundt did not achieve Vox's content posting requirements.

**ANSWER**:   Vox Media admits that Jesse Lundt frequently failed to meet his contractual

commitments.  Vox Media otherwise denies the allegations in Paragraph 64.

65.   Vox maintained Plaintiffs' employment contracts (which Vox titled "Blogger Agreements").

**ANSWER**:   To the extent the allegations in Paragraph 65 purport to describe documents filed

as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak

for themselves.  To the extent any further response is required, Vox Media otherwise denies the

allegations in Paragraph 65 except to admit that Vox Media retained copies of Plaintiffs' contracts

with Vox Media.  Vox Media denies that Plaintiffs' contracts are "employment contracts."

66.   Vox maintained records relating to Plaintiffs' and the FLSA Class' team site traffic, as well as records relating to whether Plaintiffs were meeting their contractual target demands. Those records were utilized in order to evaluate Plaintiffs' and the FLSA Class' performance as Site Managers.

**ANSWER**:    Vox Media admits that it has analytical tools that allow the company to generate quantitative data regarding website traffic and posts.  Vox Media otherwise denies the allegations in Paragraph 66.

67.    Without access to discovery, Plaintiffs are without specific knowledge as to the extent to which Vox maintains other employment records relating to Plaintiffs and the FLSA Class.

**ANSWER**:    Vox Media lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in Paragraph 67 and, on that basis, denies it.  Vox Media also denies that it maintains "employment records" with respect to independent contractors.

68.    During their employment within SB Nation as Site Managers, Plaintiffs possessed no opportunity for profit or for loss. Rather, Bradley was paid a flat $125 per month, Wakefield $50 (and later $75) per month, and Varda $400 per month, regardless of Vox's profitability or how many hours they each worked.

**ANSWER**:    Paragraph 68 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media admits that, pursuant to their respective contracts with Vox Media, Plaintiffs received a monthly rate that varied amongst them (and, for some, varied over time) as discussed *supra*.  Vox Media otherwise denies the allegations in Paragraph 68.

69.    No matter how many articles Plaintiffs created for SB Nation or how high quality those articles were, Plaintiffs would only receive a low set monthly compensation. Exs. 1-3, Blogger Agreement at A-2.

**ANSWER**:    Vox Media admits that Plaintiffs received a monthly rate that varied amongst them (and, for some, varied over time) pursuant to their respective contracts with Vox Media.  Vox Media otherwise denies the allegations in Paragraph 69.

70.    Vox "own[ed] and retain[ed] all right, title, and interest in and to the Site, including, without limitation, the domain name of the Site (including any and all credit for traffic thereto), the Site's 'look and feel' and any branding or content contained on the Site (including but not limited to the right to register and use the name of the Site or any variation thereof as a Twitter username)." Exs. 1-3, Blogger Agreement at ¶ 3(a).

**ANSWER**:    To the extent the allegations in Paragraph 70 purport to describe documents filed as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak for themselves.  To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 70.

71.    Plaintiffs assigned to Vox, "all rights, title, and interest in and to any work product [they] created…including all copyrights, trademarks and other intellectual property rights embodied therein." Exs. 1-3, Blogger Agreement at ¶ 3(b).

**ANSWER**:    To the extent the allegations in Paragraph 71 purport to describe documents filed as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak for themselves.  To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 71.

72.    Plaintiffs did not share in Vox's advertising revenue and "Vox Media, as the owner of the Work Product," could in its sole discretion "use, publish, distribute and reproduce the Work Product in [outside] media, and retain any revenue generated thereby." Exs. 1-3, Blogger Agreement at ¶ 3(c). Vox did not allow Plaintiffs to advertise their personal brands or content on their respective SB Nation websites.

**ANSWER**:    To the extent the allegations in Paragraph 72 purport to describe documents filed as Exhibits to the FAC, Vox Media respectfully refers the Court to such documents, which speak for themselves.  To the extent any further response is required, Vox Media otherwise denies the allegations in Paragraph 72.

73.    When Plaintiffs Bradley and Wakefield personally received inquiries from prospective advertisers for advertising to be placed on their respective team sites, they were each required to by Vox, and did, refer the inquiries to their respective League Managers.

**ANSWER**:    Vox Media admits that Site Managers are generally asked to refer inquiries from prospective advertisers to Vox Media for vetting and review.  Vox Media lacks knowledge or information sufficient to form a belief as to the truth or falsity of Plaintiffs' allegations that Plaintiff

Bradley and Plaintiff Wakefield referred each and every inquiry to Vox Media and, on that basis,

denies them.  Vox Media otherwise denies the allegations in Paragraph 73.

74.     Advertisers approached Plaintiff Varda many times asking if they could advertise on Twinkie Town. Initially, each time this happened, Varda would tell the advertisers that they should contact SB Nation management directly. Eventually, Varda received so many advertisement requests that she did not always respond to all such inquiries.

**ANSWER**:     Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 74 and, on that basis, denies them.

75.     It was common knowledge at SB Nation that Site Managers were not allowed to enter into advertisement agreements, much less receive any revenue from advertisements on the team sites. *See also* Exs. 1-3, Blogger Agreement at ¶ 3(e) ("[f]or the avoidance of doubt, the parties agree that Vox Media shall have exclusive control and decision-making authority regarding any and all revenue-generating opportunities with respect to the Site.").

**ANSWER**:     Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of Plaintiffs' allegations regarding what constituted "common knowledge" amongst Site

Managers and, on that basis, denies them.  Vox Media otherwise denies the allegations in

Paragraph 75, except to state that, to the extent the allegations in Paragraph 75 purport to describe

documents filed as Exhibits to the FAC, those documents speak for themselves.

76.     Plaintiffs were not required to invest in equipment or materials with respect to their employment at Vox. Plaintiffs merely used their existing home computers and smart phones to perform services for Vox.

**ANSWER**:     Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of Plaintiffs' allegations regarding their use of existing home computers and smart

phones and, on that basis, denies them.  Vox Media otherwise denies the remaining allegations in

Paragraph 76.

77.     Plaintiffs' services required no special skill. For example, no specific academic qualifications were required to be a Site Manager, much less a college degree. No specific professional experience was required of Plaintiffs. *See* ¶ 50, *supra*.

**ANSWER**:     Paragraph 77 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 77, except to admit that Vox Media did not expressly require Site Managers to have any specific academic qualifications or prior professional writing experience.

78.     Plaintiffs' employment with Vox was in the nature of a permanent relationship. Plaintiffs signed and worked under the terms of Blogger Agreements and regularly worked 30-40 hours a week or more for Vox's SB Nation.

**ANSWER**:     Paragraph 78 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 78, except to admit that Plaintiffs each signed "Blogger Agreements" with Vox Media.

79.     SB Nation entered into separate freelance contracts with some Site Managers which obligated the Site Manager to write a particular piece on a pre-defined subject. Those freelance contracts did not relate to the Site Managers' performance of duties for their respective team sites, and were stand-alone assignments.

**ANSWER**:     Vox Media admits that it previously has entered into contracts with individuals to write freelance articles for the flagship SB Nation website (www.sbnation.com) and that, in some instances, those individuals had previously and separately contracted to perform Site Manager duties for a specific team site.  Vox Media otherwise denies the allegations in Paragraph 79.

80.     Vox is a media company and its SB Nation division is in the business of sports media. Vox and SB Nation's very business could not exist without the content created by its writers, including Plaintiffs and other Site Managers. Indeed, the content created by its writers constitutes the entirety of the product offered by SB Nation. Without the existence of the content published on Plaintiffs' and the FLSA Class' team sites,[8] advertisers would not pay Vox to advertise on SB Nation sites.

**ANSWER**:     Vox Media admits that it is a media company and that its SB Nation network involves sports media, among other things.  The remaining allegations in Paragraph 80 contain

---

[8]  *Supra*, n. 7.

legal conclusions to which no response is required.  To the extent a response is required, Vox

Media denies the remaining allegations in Paragraph 80.

81.     As a matter of economic reality, Plaintiffs were dependent on Vox for income, and therefore were employees of Vox. Given the number of hours Plaintiffs worked for Vox, the possibility and extent of outside employment was heavily curtailed.

**ANSWER**:     Paragraph 81 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 81.

## ANSWER TO "WILLFULNESS" ALLEGATIONS

82.     James Bankoff ("Bankoff") is the current Chief Executive Officer (CEO) of Vox and has served in that role since approximately 2009.

**ANSWER**:     Vox Media admits the allegations in Paragraph 82.

83.     Prior to his tenure at Vox, Bankoff served as Executive Vice-President of Programming and Products at America Online, Inc. ("AOL") from approximately March 2002 to approximately March 2007.

**ANSWER**:     Vox Media admits that Bankoff served as Executive Vice-President of

Programming and Products at AOL from approximately 2003 through approximately December

2006.  Vox Media otherwise denies the allegations in Paragraph 83.

84.     Marty Moe ("Moe") is the current President of Vox and has served in that role since approximately 2011.

**ANSWER**:     Vox Media admits that Marty Moe is the current President of Vox Media and has

served in that role since approximately February 2014.  Vox Media otherwise denies the remaining

allegations in Paragraph 84.

85.     Prior to his tenure at Vox, Moe served as a Senior Vice President of AOL's Media Unit from approximately 2001 to approximately October 2010.

**ANSWER**:       Vox Media admits that Moe started working at AOL in approximately 2001 and

that Moe served as Senior Vice President of AOL's Media Unit from approximately 2007 through

approximately 2010.  Vox Media otherwise denies the allegations in Paragraph 85.

86.     Moe is an attorney and practiced law at the prominent law firm of Skadden, Arps, Slate, Meagher & Flom LLP for five (5) years prior to joining AOL. Prior to his tenure at Skadden Arps, Moe clerked on the U.S. Court of Appeals for the District of Columbia Circuit.

**ANSWER**:       Vox Media admits that Moe has a juris doctorate. Vox Media further admits that

Moe practiced law at Skadden, Arps, Slate, Meagher & Flom LLP for approximately four years

prior to working at AOL.  Vox Media further admits that Moe worked as a law clerk on the U.S.

Court of Appeals for the D.C. Circuit.  Vox Media otherwise denies the allegations in Paragraph

86.

87.     Lauren Fisher ("Fisher") has served as General Counsel and Chief Legal Officer at Vox since approximately 2008.

**ANSWER**:       Vox Media admits that Lauren Fisher served as General Counsel at Vox Media

from approximately August 2009 through approximately April 2016, when she became Chief

Legal Officer at Vox Media.  Vox Media otherwise denies the allegations in Paragraph 87.

88.     Prior to her tenure as General Counsel at Vox, Fisher served in AOL's General Counsel's office as an attorney from approximately 2001 - 2007.

**ANSWER**:       Vox Media admits the allegations in Paragraph 88.

89.     In 1999, Kelly Hallissey and several other plaintiffs filed a nationwide FLSA collective action lawsuit on behalf of themselves and other "Community Leaders" against AOL, alleging, *inter-alia*, AOL's failure to pay its Community Leaders minimum wages required by 29 U.S.C. § 206.  *See* Case No. 99-CIV-3785 (S.D.N.Y.) ("*Hallissey*"); *Hallissey v. America Online, Inc.*, 2006 U.S. Dist. LEXIS 12964 (S.D.N.Y., Mar. 10, 2006).

**ANSWER**:       The allegations in Paragraph 89 purport to describe the docket of and documents

filed in a separate litigation.  Vox Media respectfully refers the Court to the referenced docket and

documents, which speak for themselves.  *See* Case No. 99-cv-3785 (S.D.N.Y.).  To the extent any

further response is required, Vox Media otherwise denies the allegations in Paragraph 89.

90.    The *Hallissey* case involved similar factual and legal issues as in the instant litigation:  *i.e.*, the failure to classify those performing services for both defendants as "employees" under the FLSA, the failure of both defendants to ensure compliance with the FLSA's minimum wage requirements as it related to each of the plaintiffs, the overlapping or similarity in duties of AOL's CL's and Vox's Site Managers, including but not limited to:  creating and editing online content, moderating online community interaction, and managing or assisting other content creators. *Id.* at *3-4. Plaintiffs in both actions were integral to the operation of the businesses of both defendants, and neither set of plaintiffs enjoyed the opportunity of profit or loss. In neither action did the positions in which plaintiffs worked require special skill or investment. In both actions the plaintiffs' work conditions and rates of pay were controlled by the defendants.

**ANSWER**:    Paragraph 90 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 90.

91.    The United States Department of Labor, Wage and Hour Division ("USDOL") conducted an investigation of AOL concerning the allegations in *Hallissey*.

**ANSWER**:    Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegation in Paragraph 91 and, on that basis, denies it.

92.    The *Hallissey* case was widely publicized in the media from its inception through settlement.[9]

**ANSWER**:    Vox Media lacks knowledge or information sufficient to form a belief as to the truth

or falsity of the allegation in Paragraph 92 that the *Hallissey* litigation "was widely publicized,"

and, on that basis, denies it.  Vox Media admits that the URLs provided in footnote 9 of the FAC

refer to the *Hallissey* litigation.

93.    In 2000, AOL filed a motion to dismiss the *Hallissey* action under Fed. R. Civ. P. 12(b)(1) under a jointly agreed upon discovery protocol, in which evidence relating to eleven

---

[9]  For example, *see*, "'Volunteer' Community Leaders Sue AOL for $20m," Computer Business Review, May 27, 1999, *available at:*  http://www.cbronline.com/news/volunteer_community_leaders_sue_aol_for_20m (last accessed 10/20/2017); "The Little People VS. America Online," Forbes, February 19, 2001, *available at:* https://www.forbes.com/asap/2001/0219/060.html (last accessed 10/20/2017); "AOL Settled with Unpaid 'Volunteers' for $15 Million," Columbia Journalism Review, February 10, 2011, available at: http://archives.cjr.org/the_news_frontier/aol_settled_with_unpaid_volunt.php (last accessed 10/20/2017).

(11) representative plaintiffs was evaluated, under the standards of Fed. R. Civ. P. 56. *See Hallissey v. America Online, Inc*., 2006 U.S. Dist. LEXIS 12964 (S.D.N.Y., Mar. 10, 2006) at *6-8.

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and filings in the referenced *Hallissey* litigation.

94.    In moving to dismiss the *Hallissey* action, AOL contended that its Community Leaders were not "employees" within the meaning of the FLSA, but rather were "volunteers". *Id.*

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and court filings in the referenced *Hallissey* litigation.

95.    On March 10, 2006, the *Hallissey* Court, per Duffy, J., rejected AOL's volunteer defense and held that genuine issues of material fact existed as to whether the Community Leaders were AOL's employees within the meaning of the FLSA. *Id*. at *10.

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and filings in the referenced *Hallissey* litigation.

96.    On February 19, 2008, the *Hallissey* Court certified the action as a nationwide collective action. *Hallissey v. America Online, Inc*., 2008 WL 465112 (S.D.N.Y., Feb. 19, 2008).

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and filings in the referenced *Hallissey* litigation.

97.    On December 21, 2009, the parties in *Hallissey* submitted a joint motion for preliminary approval of settlement in the amount of $15 Million, ECF No. 2651, which the *Hallissey* Court granted on February 2, 2010, ECF No. 2657.

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and filings in the referenced *Hallissey* litigation.

98.    On April 29, 2010, the parties in *Hallissey* submitted a joint application for final approval of settlement in the amount of $15 Million, ECF No. 2666, which the *Hallissey* Court granted on May 25, 2010, ECF No. 2670.

**ANSWER**:    Vox Media respectfully refers the Court to the relevant docket and filings in the referenced *Hallissey* litigation.

99.     During their tenure at AOL, Bankoff, Moe and Fisher were well aware of the *Hallissey* case and the USDOL investigation.

**ANSWER**:     Vox Media denies the allegations in Paragraph 99 except to state that during their tenure at AOL Bankoff and Moe had a limited, high-level, general awareness that there was a dispute regarding the classification of AOL's Community Leaders.

100.     Fisher, as part of the General Counsel's office, received and was privy to legal advice from AOL's outside labor counsel concerning the *Hallissey* litigation.

**ANSWER**:     Vox Media denies the allegations in Paragraph 100.

101.     During all times relevant to this action, Bankoff, Moe and Fisher were aware of the $15 Million settlement and Judge Duffy's March 10, 2006 opinion in *Hallissey*.

**ANSWER**:     Vox Media denies the allegations in Paragraph 101 except to state that Bankoff was generally aware that a dispute over the classification of AOL's Community Leaders had been settled.

102.     During all relevant times, Fisher was aware of and, indeed, advised Vox in relation to its decision to continually classify Plaintiffs and the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime required by law.

**ANSWER**:     Vox Media denies the allegations in Paragraph 102 except to state, without waiver of attorney-client or any other applicable privilege, that Fisher was involved in some of Vox Media's decisions to classify certain Site Managers as independent contractors.

103.     Fisher signed the Blogger Agreements for Vox. Exs. 1-3 at pp.3.

**ANSWER**:     Vox Media admits that Fisher's digital signature is applied to the Blogger Agreements attached to the FAC as Exhibits 1-3.

104.     During all relevant times, Bankoff and Moe were also aware of Vox's decision to classify the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime required by law.

**ANSWER**:     To the extent Paragraph 104 requires a legal conclusion no response is required. To the extent any further response is required, Vox Media denies the allegations in Paragraph 104

except to state that Bankoff and Moe were aware that certain Site Managers were classified as

independent contractors.

105.    As senior executives of Vox, through their own acts and/or omissions, as well as those of their agents, Bankoff, Moe and Fisher were responsible for the decision to classify the FLSA Class Members as independent contractors and fail to pay them at least the minimum wage and overtime pay required by law.

**ANSWER**:    Paragraph 105 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 105 except to state,

without waiver of attorney-client or any other applicable privilege, that Fisher was involved in

some of Vox Media's decisions to classify certain Site Managers as independent contractors.

106.    In approximately late 2013, Plaintiff Bradley complained to her League Manager Travis Hughes that she was paid inadequate wages. Hughes replied that wages were determined by team site traffic. Bradley subsequently helped increase Mile High Hockey's site traffic significantly, yet her monthly salary never increased.

**ANSWER**:    Vox Media denies the allegations in Paragraph 106.

107.    Upon information and belief, Vox received complaints from other Site Managers concerning Vox's pay practices.[10]

**ANSWER**:    Vox Media denies the allegations in Paragraph 107.

108.    Given Vox's awareness of the *Hallissey* litigation, the related USDOL investigation, and internal complaints from Plaintiff Bradley and other Site Managers, Vox knew it was illegal to classify the FLSA Class Members as independent contractors and fail to ensure they were paid at least the minimum wage and overtime required by law.

**ANSWER**:    Paragraph 108 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 108.

---

[10]  *See Supra* n. 1 ("I read [SB Nation editor-in-chief Elena] Bergeron and [general manager Kevin] Lockland's quotes to a few of the site managers. One site manager promptly cleaned up the water Bergeron and Lockland had muddied:  I would guess that 50 percent of our content comes from folks not getting anything. [Our league manager] knows that — we talked about how to use unpaid writers … and I would be shocked if his bosses didn't know that. And [Lockland's answer] seems like an attempt to **blur the lines between fanposts**, which are written and posted by fans with no oversight/editing by us (and thus are the way that most of the big screw-ups of the past have happened), **and actual unpaid contributors**, who write articles on a normal schedule that are edited and posted in the main layout. **Again, they have to know the difference between those roles, so I'm not sure if they're confused or trying to deliberately obfuscate the issue**.") (Emphasis added).

109.    Despite its continuing knowledge of the illegality of these practices, Vox willfully and continually refused to pay the FLSA Class Members minimum wages and overtime due for hours worked, and thus a three-year statute of limitations is applicable to FLSA Class Members in this matter. *See* 29 U.S.C. § 255(a); *Herman v. RSR Sec. Servs. Ltd*., 172 F.3d 132, 141–42 (2d Cir. 1999); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 967 (6th Cir. 1991); *Galloway v. Chugach Gov't Servs., Inc*., 199 F. Supp. 3d 145, 151-153 (D.D.C. 2016).

**ANSWER**:    Paragraph 109 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 109 except to admit that Vox Media has classified most Site Managers as independent contractors.

110.    Vox does not maintain accurate records of the actual hours that Plaintiffs and FLSA Class Members worked each workday and the total hours worked each workweek as required by the FLSA. *See* 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c) (requiring employers to maintain payroll records for three years and time sheets for two years, including the exact number of hours worked each day and each week).

**ANSWER**:    Paragraph 110 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 110. except to admit that Plaintiffs and other Site Managers do not have a fixed schedule and do not report their hours worked to Vox Media.

111.    Vox knew or should have known that Plaintiffs and FLSA Class Members were employees and were not exempt from the FLSA's minimum wage or overtime requirements.

**ANSWER**:    Paragraph 111 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 111.

112.    Vox is a sophisticated multi-national business worth approximately $1 Billion. Vox has access to knowledgeable human resource specialists and competent labor counsel.

**ANSWER**:    Vox Media admits that it is a multi-national business that has previously received equity investments valuing the company at approximately $1 billion.  Vox Media further admits that it has access to human resources personnel and attorneys.  Vox Media otherwise denies the allegations in Paragraph 112.

113.     Vox has acted willfully and with reckless disregard of clearly applicable FLSA provisions by failing to compensate Plaintiffs and the FLSA Class with pay of at least $7.25 per hour, as required by 29 U.S.C. § 206(a).

**ANSWER**:     Paragraph 113 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 113.

114.     Vox has acted willfully and with reckless disregard of clearly applicable FLSA provisions by failing to compensate Plaintiffs and the FLSA Class for all hours worked in excess of forty (40) during the workweek at a rate of not less than one and one half (1.5) times the minimum wage, as required by 29 U.S.C. §§ 206(a), 207(a).

**ANSWER**:     Paragraph 114 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 114.

## ANSWER TO "COLLECTIVE ACTION" ALLEGATIONS

115.     Plaintiffs bring this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Class defined above.

**ANSWER**:     Vox Media admits that Plaintiffs purport to bring claims under the FLSA for failure to pay minimum wage and overtime on behalf of themselves and a purported class of similarly situated individuals pursuant to 29 U.S.C. § 216(b).  Vox Media denies that Plaintiffs can establish such claims or a collective action under the FLSA and denies the remaining allegations in Paragraph 115.

116.     Plaintiffs desire to pursue their claims on behalf of themselves and any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

**ANSWER**:     Vox Media admits that Plaintiffs purport to bring claims under the FLSA for failure to pay minimum wage and overtime on behalf of themselves and a purported class of similarly situated individuals pursuant to 29 U.S.C. § 216(b).  Vox Media denies that Plaintiffs can establish such claims or a collective action under the FLSA and denies the remaining allegations in Paragraph 116.

117.    Plaintiffs and the FLSA Class are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, *inter alia*, all such individuals were misclassified as independent contractors, worked pursuant to Vox's previously described common pay practices and, as a result of such practices, were not paid the full and legally mandated minimum wage or overtime premiums for hours worked over forty (40) during the workweek. Resolution of this action requires inquiry into common facts, including, *inter alia*, Vox's common compensation, timekeeping, and payroll practices.

**ANSWER**:    Paragraph 117 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 117 and denies that Plaintiffs can establish a collective action under the FLSA.

118.    Specifically, Vox paid Plaintiffs and the FLSA Class on a monthly basis, but failed to pay Plaintiffs and the FLSA Class at least the minimum wage required by 29 U.S.C. § 206(a), and failed to pay overtime at time and a half (1 ½) the employee's regular rate (not to fall below $7.25 per hour) as required by the FLSA for all hours worked in excess of forty (40) per workweek.

**ANSWER**:    Paragraph 118 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 118, except to admit that Plaintiffs were paid on a monthly basis.

119.    The similarly situated employees are known to Vox, are readily identifiable, and may be located through Vox business and human resource records.

**ANSWER**:    Paragraph 119 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media admits that it has records regarding its contracts with Plaintiffs and other Site Managers.  Vox Media otherwise denies the allegations in Paragraph 119 and denies that Plaintiffs can establish a collective action under the FLSA.

120.    Vox employs many FLSA Class Members. These similarly situated employees may be readily notified of this action through direct U.S. mail and/or other appropriate means, and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for overtime compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

**ANSWER**:     Paragraph 120 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 120 and denies that Plaintiffs can establish a collective action under the FLSA.

## **ANSWER TO "COUNT I" ALLEGATIONS**

121.    All previous paragraphs are incorporated as though fully set forth herein.

**ANSWER**:     Vox Media incorporates and realleges each and every response set forth in all previous paragraphs of its Answer as though set forth here in full.

122.    The FLSA requires that covered employees be compensated for all hours worked at a rate of not less than $7.25 per hour. *See* 29 U.S.C. § 206(a)(1).

**ANSWER**:     Paragraph 122 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media respectfully refers the Court to the applicable statute and its implementing regulations and/or case law.

123.    Vox is subject to the wage requirements of the FLSA because Vox is an "employer" under 29 U.S.C. § 203(d).

**ANSWER**:     Paragraph 122 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 123 with respect to Plaintiffs.

124.    At all relevant times, Vox is an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

**ANSWER**:     Paragraph 124 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 124 with respect to Plaintiffs.

125.    During all relevant times, Plaintiffs and the FLSA Class are covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

**ANSWER**:      Paragraph 125 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 125.

126.     Plaintiffs and the FLSA Class are not exempt from the requirements of the FLSA.
Plaintiffs and the FLSA Class are entitled to be paid for all hours worked at a rate of not less than
$7.25 per hour, pursuant to 29 U.S.C. § 206(a)(1).

**ANSWER**:      Paragraph 126 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 126.

127.     Vox's compensation scheme applicable to Plaintiffs and the FLSA Class failed to
comply with 29 U.S.C. § 206(a)(1).

**ANSWER**:      Paragraph 127 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 127.

128.     Vox knowingly failed to compensate Plaintiffs and the FLSA Class for all hours
worked at a rate of not less than $7.25 per hour, in violation of 29 U.S.C. § 206(a)(1).

**ANSWER**:      Paragraph 128 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 128.

129.     Vox also failed to make, keep, and preserve records with respect to Plaintiffs and
the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in
violation of the FLSA. 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

**ANSWER**:      Paragraph 129 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 129.

130.     In violating the FLSA, Vox acted willfully and with reckless disregard of clearly
applicable FLSA provisions.

**ANSWER**:      Paragraph 130 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 130.

131.     Pursuant to 29 U.S.C. § 216(b), employers such as Vox, who intentionally fail to
pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid
wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid
wages.

**ANSWER**:     Paragraph 131 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 131.

## ANSWER TO "COUNT II" ALLEGATIONS

132.    All previous paragraphs are incorporated as though fully set forth herein.

**ANSWER**:     Vox Media incorporates and realleges each and every response set forth in all

previous paragraphs of its Answer as though set forth here in full.

133.    The FLSA requires that covered employees be compensated for all hours worked
in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the
regular rate at which they are employed, not to fall below 1 ½ times the minimum wage. *See* 29
U.S.C. §§ 206(a)(1), 207(a)(1).

**ANSWER**:     Paragraph 133 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media respectfully refers the Court to the applicable statute and

its implementing regulations and/or case law.

134.    Vox is subject to the wage requirements of the FLSA because Vox is an "employer"
under 29 U.S.C. § 203(d).

**ANSWER**:     Paragraph 134 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 134 with respect to

Plaintiffs.

135.    At all relevant times, Vox is an "employer" engaged in interstate commerce and/or
in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

**ANSWER**:     Paragraph 135 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 135 with respect to

Plaintiffs.

136.    During all relevant times, Plaintiffs and the FLSA Class are covered employees
entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

**ANSWER**:     Paragraph 136 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 136.

137.     Plaintiffs and the FLSA Class are not exempt from the requirements of the FLSA. Plaintiffs and the FLSA Class are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant, not to fall below 1 ½ times the minimum wage. *See* 29 U.S.C. §§ 206(a)(1), 207(a)(1).

**ANSWER**:     Paragraph 137 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 137.

138.     Vox's compensation scheme applicable to Plaintiffs and the FLSA Class failed to comply with 29 U.S.C. §§ 206(a)(1), 207(a)(1).

**ANSWER**:     Paragraph 138 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 138.

139.     Vox knowingly failed to compensate Plaintiffs and the FLSA Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, not to fall below 1 ½ times the minimum wage, in violation of 29 U.S.C. §§ 206(a)(1), 207(a)(1).

**ANSWER**:     Paragraph 139 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 139.

140.     Vox also failed to make, keep, and preserve records with respect to Plaintiffs and the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in violation of the FLSA. 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

**ANSWER**:     Paragraph 140 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 140.

141.     In violating the FLSA, Vox acted willfully and with reckless disregard of clearly applicable FLSA provisions.

**ANSWER**:     Paragraph 141 contains legal conclusions to which no response is required.  To the

extent a response is required, Vox Media denies the allegations in Paragraph 141.

142.     Pursuant to 29 U.S.C. § 216(b), employers such as Vox, who intentionally fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid

wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

**ANSWER**:    Paragraph 142 contains legal conclusions to which no response is required.  To the extent a response is required, Vox Media denies the allegations in Paragraph 142.

## ANSWER TO PRAYER FOR RELIEF

Vox Media denies that Plaintiffs are entitled to relief against Vox Media and requests that the Court dismiss all claims against Vox Media with prejudice and order such further relief as the Court deems just and proper.

## ANSWER TO DEMAND FOR JURY TRIAL

Vox Media denies the allegations of Plaintiffs' demand for a jury trial, except to admit that Plaintiffs purport to demand a jury trial.

## AFFIRMATIVE AND OTHER DEFENSES

Vox Media has not completed its full investigation of the facts of this case, has not completed discovery in this matter, and has not completed its preparation for trial.  The defenses asserted herein are based on Vox Media's knowledge, information, and belief at this time.  Vox Media specifically reserves the right to assert additional affirmative or other defenses and/or to modify, amend, or supplement any defense contained herein at any time.  Without admitting any of the facts alleged in the FAC, Vox Media asserts and alleges the following separate and additional defenses.  Each and every affirmative defense herein is specifically asserted and alleged against all current and putative individual plaintiffs, including the named Plaintiffs and all opt-in plaintiffs to the collective action (collectively referred to herein as "Plaintiffs").  Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to it as to any element of Plaintiffs' claims, Vox Media asserts the following affirmative and other defenses:

## FIRST DEFENSE

The FAC and each of Plaintiffs' purported claims for relief stated therein fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

Some or all of Plaintiffs' purported claims for relief are barred in whole or in part by the applicable statute(s) of limitations.

## THIRD DEFENSE

The FAC, and each purported cause of action therein, is barred on the grounds that Plaintiffs are independent contractors as a matter of law.  Vox Media was not and/or is not the employer of Plaintiffs.

## FOURTH DEFENSE

Plaintiffs' FAC, and each purported cause of action alleged therein against Vox Media, is barred by the doctrine of unclean hands.

## FIFTH DEFENSE

Plaintiffs are guilty of undue delay in filing and prosecuting this suit, and accordingly, this action is barred by the doctrine of laches.

## SIXTH DEFENSE

The claims alleged in the FAC and relief prayed for therein is barred, in whole or in part, because Plaintiffs consented to and acquiesced in the alleged conduct by Vox Media of which Plaintiffs now complain.

## SEVENTH DEFENSE

Plaintiffs are barred from relief, in whole or in part, to the extent that their claims are precluded under the doctrines of res judicata, collateral estoppel, estoppel, waiver, or other related equitable doctrines.

## EIGHTH DEFENSE

Plaintiffs are barred from relief, in whole or in part, to the extent they have released and/or waived any right to recover any relief pursuant to the FAC, or any purported cause of action alleged therein.

## NINTH DEFENSE

Plaintiffs are barred from relief, in whole or in part, to the extent it results in an unjust enrichment to Plaintiffs and/or any person on whose behalf relief is sought, including but not limited to the extent to which recovery under one claim would be duplicative of recovery under another.

## TENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent Vox Media's acts and/or omissions were excused.

## ELEVENTH DEFENSE

The FAC, and each purported cause of action contained therein against Vox Media, is barred in whole or in part, to the extent the *de minimus* doctrine applies to Plaintiffs' claims.

## TWELFTH DEFENSE

The FAC, and each purported cause of action contained therein, is barred to the extent Plaintiffs lack the requisite standing to assert each purported cause of action, including, but not

limited to, the fact that Plaintiffs lack the requisite standing to seek injunctive relief because they are not currently contractors for Vox Media.

### THIRTEENTH DEFENSE

Vox Media has fully satisfied, fulfilled, and performed each and every obligation and duty imposed by law or contract, and owes no further obligations to the Plaintiffs, and, therefore, Plaintiffs are barred from maintaining this action against Vox Media.

### FOURTEENTH DEFENSE

The named plaintiffs and any individual alleged to be similarly situated to the named plaintiffs are exempt from overtime requirements under the FLSA.

### FIFTEENTH DEFENSE

The current and any putative members of the putative collective action are not "similarly situated," and therefore this action is not properly maintained as a collective action.

### SIXTEENTH DEFENSE

The claims and interests of the named plaintiffs, and Vox Media's defenses thereto, are not typical or representative of the putative claims or related defenses of the putative collective as a whole, and named plaintiffs are not suitable class representatives.  Therefore, named plaintiffs cannot satisfy the prerequisites for a collective action set forth under the FLSA.

### SEVENTEENTH DEFENSE

This action is not properly maintained as a collective action because individualized questions of law and fact predominate over any semblance of common questions.  In addition, the proof particular to each putative collective member's claims and the defenses thereto will vary widely.

## EIGHTEENTH DEFENSE

As applied to this putative collective, collective certification pursuant to the FLSA fails to provide adequate due process protections and would violate the Rules Enabling Act, 28 U.S.C. § 2072, inasmuch as it constitutes trial by formula and unfairly restricts Vox Media's right to litigate affirmative defenses to the individual claims of Plaintiffs, and therefore denies Vox Media the protection of the Due Process Clause of the United States Constitution and violates the Rules Enabling Act.

## NINETEENTH DEFENSE

Certification of a collective, based upon the facts and circumstances of this case, would constitute a denial of Vox Media's right to due process under the United States Constitution.

## TWENTIETH DEFENSE

Plaintiffs' demand, on behalf of themselves and the putative collective, for liquidated damages renders this action inappropriate for treatment as a collective action, and award of such damages on an aggregate basis would deny Vox Media due process.

## TWENTY-FIRST DEFENSE

Vox Media's business practices with respect to Plaintiffs have been pursuant to a good faith belief that those practices are in conformity with federal wage laws.  Vox Media acted in good faith reliance upon the reasonable interpretation of applicable law.

## TWENTY-SECOND DEFENSE

Expressly denying that Vox Media engaged in any unlawful conduct, some or all of the relief requested by Plaintiffs is barred because Vox Media's actions were not willful.  Vox Media acted at all times on the basis of a good faith and reasonable belief that its actions were in conformity with all applicable laws.  Liquidated damages are therefore unavailable.

## TWENTY-THIRD DEFENSE

Any recovery on Plaintiffs' FAC, or any cause of action contained therein, may be barred by Vox Media's compliance or substantial compliance with all applicable laws underlying Plaintiffs' claims.

## TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred or should be reduced, in whole or in part, by exclusions, exceptions, credits, recoupment, or offsets permissible under the FLSA.

## TWENTY-FIFTH DEFENSE

The FAC, and each purported cause of action contained therein, is barred in whole or in part, to the extent that damages, if any, resulted from the acts and/or omissions, including failure to take reasonable action to mitigate said damages if any, of Plaintiffs or any person on whose behalf relief is sought.

## TWENTY-SIXTH DEFENSE

Plaintiffs have an adequate remedy at law. Therefore, injunctive, equitable, and/or declaratory relief is inappropriate.

## TWENTY-SEVENTH DEFENSE

Any penalties and fines sought are unconstitutional and excessive under the United States Constitution, and specifically under the Excessive Fines Clause and the Due Process Clause.

## TWENTY-EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the provisions of Section 4 of the Portal-to-Portal Act, 29 U.S.C. § 254, as to all hours during which they were engaged in certain activities which were non-compensable, such as taking breaks, taking care of personal business, or traveling to the actual place of performance.

## **TWENTY-NINTH DEFENSE**

Plaintiffs' claims are barred to the extent that Plaintiffs did not work more than forty (40) hours in one workweek.

## **THIRTIETH DEFENSE**

Plaintiffs' claims are barred by the provisions of Section 101 of the Portal-to-Portal Act, 29 U.S.C. § 259, because all actions taken in connection with Plaintiffs' compensation were done in good faith in conformity with and in reliance upon written administrative regulations, orders, rulings, approvals, interpretations, and written and unwritten administrative practices or enforcement policies of the Administrator of the Wage and Hour Division of the United States Department of Labor.

## **THIRTY-FIRST DEFENSE**

Vox Media denies all allegations not expressly admitted and specifically reserves the right to amend this Answer and to raise any additional defenses, cross-claims, and third party claims, not asserted herein as may be warranted by the revelation of information during discovery and investigation, including but not limited to the delineation of such defenses against the putative collective members because no collective has been certified, and the putative collective members are not parties to this litigation.

**WHEREFORE**, Vox Media asks this Court to dismiss plaintiffs' FAC, enter judgment in favor of Vox Media, award Vox Media its reasonable costs, and grant Vox Media such other and further relief as the Court deems appropriate.

Dated:   October 4, 2018                    Respectfully Submitted,

  /s/ Jason C. Schwartz
Jason C. Schwartz
Greta B. Williams (application for admission
forthcoming)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5303
Telephone: (202) 955-8500
Fax: (202) 467-0539
jschwartz@gibsondunn.com
gbwilliams@gibsondunn.com

Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Fax: (213) 229-7520
tboutrous@gibsondunn.com

*Attorneys for Defendant*